**Affirmed and Majority and Concurring Opinions filed December 13, 2011**



In The

# Fourteenth Court of Appeals

### NO. 14-10-01089-CR

### JACKIE JOHNSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the County Criminal Court at Law No. 11
Harris County, Texas
Trial Court Cause No. 1686082**

## MAJORITY OPINION

Appellant Jackie Johnson appeals the trial court's denial of his motion to suppress. After Johnson's motion was denied, he pleaded guilty to misdemeanor possession of marijuana and, with an agreed recommendation from the State, received a sentence of twenty days' confinement in jail. In a single issue, Johnson contends the trial court abused its discretion in denying his motion to suppress. Finding no abuse of discretion, we affirm.

At the hearing on Johnson's motion to suppress, the State presented Sergeant Stephen Hendrie of the Houston Police Department. Hendrie testified that around 11:30 p.m. on June 7, 2010, he responded to a 911 call concerning a suspicious person described as a tall, black male wearing a black shirt and beige pants who was lurking around the Copper Cove Apartments at 12901 Brant Rock Drive. Hendrie knew from past experience that robberies had occurred at this complex, and he was concerned the suspicious person might be a robbery suspect. As Hendrie drove by the apartments, he saw a car backing into a parking space outside the front entrance gate of the complex. Because the car's headlights were on and the engine was running, Hendrie believed the car might be in use as a getaway car in a robbery. Hendrie parked his marked police vehicle at an angle in front of the car, partially blocking it,[1] and, because it was dark, he shined his spotlight into the car. Hendrie did not activate his siren or emergency lights, and he did not use a bullhorn or loudspeaker to contact the car's driver, Johnson. Hendrie got out of his vehicle and walked toward the car while asking Johnson in a loud voice, "What's going on? What are you doing out here?" Hendrie testified that he was using a loud voice, which he described as his "outside voice," because initially he "wasn't sure if [Johnson's] windows were down or up." As he approached, he did not use a flashlight, but kept the spotlight on the car.

Hendrie also asked Johnson if he lived there and if he had identification. Johnson told Hendrie that he lived at the complex, and he had identification, but his identification did not reflect the complex's address. As Hendrie approached the passenger side of the car, he saw that the car's windows were down, and he detected a faint odor of marijuana. Hendrie smelled a stronger odor of marijuana as he walked around to the driver's side

---

[1] Specifically, Hendrie testified that he "pulled [his] car to the corner of [Johnson's] car." The trial court asked Hendrie if his vehicle was blocking Johnson's, and he answered, "It's - - it's in the way a little bit, but not - - I wasn't totally blocking it, no," and stated that Johnson probably could have maneuvered around him.

window, which led him to suspect Johnson had marijuana in the car. At that point, Hendrie asked Johnson to step out of the car. When he looked inside the car, Hendrie saw a small package of marijuana sitting on the console.[2] He arrested Johnson.

On cross-examination, Hendrie denied that he detained Johnson or told him he could not leave when he first encountered him. Hendrie admitted that he "maybe" used an "authoritative voice," but he explained that he spoke loudly to ensure Johnson would hear him. Hendrie also stated that, even though his police vehicle was parked partially in front of Johnson's car and he walked in front of Johnson's car as he approached the driver's side door, he was not trying to prevent Johnson from leaving and Johnson could have driven away. When asked whether he instructed Johnson to put his hands up when he got out of the car, Hendrie agreed it was possible, but he did not recall doing so. Hendrie admitted that he did not witness Johnson engaging in any criminal activity when he approached him, nor did Johnson appear to be under the influence of either alcohol or marijuana. Hendrie also acknowledged that no robberies were reported at the apartment complex that night.

Although the caller reported seeing a black male in a black shirt and beige pants, Hendrie acknowledged that Johnson, a black male, had on a dark shirt and dark pants. Hendrie disagreed, however, that the difference in the color of Johnson's pants meant that Johnson did not match the suspect's overall description. Hendrie also acknowledged that it was possible that he drew his pistol during the encounter, but he did not believe he did so because he "didn't feel threatened." He agreed that Johnson did what he asked him to do. Finally, Hendrie acknowledged that he responded to the 911 call concerning a suspicious person about thirty minutes after it came in, and was unable to contact the person who made the call. He also agreed that the area where he saw Johnson was in a different part of the apartment complex than where the caller's apartment was located.

---

[2] Hendrie also found a stun gun and a mask that covers the nose and mouth in Johnson's car. Johnson testified that he used the mask for his work at a molding and fabrication company, and a police report reflected that he told an officer that he carried the stun gun because he had been robbed before.

After the State rested, Johnson called David T. Davis to testify. Davis, a licensed private investigator with a law-enforcement background, testified that Johnson lived at the Copper Cove Apartments and was parked near his apartment the night of his arrest. In response to a hypothetical question, Davis testified that, based on his experience as a former state trooper with the Department of Public Safety, if he were an officer responding to the suspicious person call, he would first contact and speak with the complainant and then conduct an investigation of the premises. Davis also testified that if he were a uniformed officer in a marked vehicle and he pulled up to a suspect's vehicle and shined his spotlight into the vehicle's windshield, he would intend to detain the suspect.

Johnson also testified at the hearing. He stated that he lived at the Copper Cove Apartments with his girlfriend, and his mother also lived in another apartment in the complex. He admitted he has previously been convicted of felony theft. On the evening of his arrest, he picked up his mother from work and dropped her off at her apartment. He could not find a parking place inside the complex, so he drove outside the gate to park in the available spaces there. As he was backing into a parking space, Hendrie, who was wearing a uniform, approached the right side of his car in a marked police vehicle. Hendrie drove his vehicle in front of Johnson's at a forty-five degree angle "like a T shape where [he] couldn't go anywhere" and shined a bright spotlight in his face. Hendrie "aggressively" walked toward him and "yelled" at him to put his hands up. As he gave the command, Hendrie drew his weapon. Johnson did as Hendrie instructed.

According to Johnson, Hendrie first approached Johnson's car from the passenger side and looked in the vehicle; he then walked around to the driver's side and opened the door. Hendrie asked to see Johnson's driver's license, but then grabbed his arm and pulled him out of the car saying, "Don't worry about it." Hendrie turned Johnson around, handcuffed him, put him in the police car, and proceeded to search Johnson's car. Johnson testified that from the time Hendrie pulled up to his car, he did not feel free to

4

leave. He also testified that the marijuana Hendrie found was not on the console but underneath a cup in the cup holder.

After the trial court heard closing arguments, the trial court announced that it was denying the motion to suppress. In making its ruling, the trial court stated, "I do believe that the officer acted reasonably under the circumstances and did have articulable facts that justified the minimal detention." The trial court did not make findings of fact or conclusions of law.

## II

In his sole issue, Johnson contends that the trial court erred in concluding that a reasonable person in Johnson's position would have felt free to leave or terminate the interaction with Sergeant Hendrie, who "had practically blocked [Johnson's] vehicle, shined his spotlight into [Johnson's] vehicle, and authoritatively called out to [Johnson] to produce identification." Johnson contends this case should be reversed based on the holdings of *Crain v. State*, 315 S.W.3d 43 (Tex. Crim. App. 2010), and *State v. Garcia-Cantu*, 253 S.W.3d 236 (Tex. Crim. App. 2008). Although we agree that these cases are instructive, they do not compel a reversal.

## A

We review the trial court's ruling on a motion to suppress under an abuse-of-discretion standard. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005); *Thomas v. State*, 297 S.W.3d 458, 460 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). We give almost total deference to the trial court's determination of historical facts but review de novo the trial court's application of the law to those facts. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000), *modified on other grounds*, *State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006); *Thomas*, 297 S.W.3d at 460. When the trial court does not make explicit findings of fact, we infer the necessary factual findings that support the trial court's ruling if the record evidence supports these implied fact findings.

*Garcia-Cantu*, 253 S.W.3d at 241; *Ross*, 32 S.W.3d at 855. Thus, the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Garcia-Cantu*, 253 S.W.3d at 241. But the question of whether a given set of historical facts amount to a consensual police-citizen encounter or a detention under the Fourth Amendment is subject to a de novo review because that is an issue of law. *Id.*

There are three distinct categories of interactions between police officers and citizens: (1) encounters, (2) investigative detentions, and (3) arrests. *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011); *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). A detention implicates the Fourth Amendment's search and seizure restrictions and requires articulable suspicion to support a temporary seizure, while an encounter is not subject to any Fourth Amendment requirements or restrictions. *Garcia-Cantu*, 253 S.W.3d at 238. A police officer is just as free as anyone to stop and question a fellow citizen. *Woodard*, 341 S.W.3d at 411; *Castleberry*, 332 S.W.3d at 466. An officer may, without reasonable suspicion, request identification and information from a citizen. *Woodard*, 341 S.W.3d at 411. Even if the officer did not tell the citizen that the request for identification or information may be ignored, the fact that the citizen complied with the request does not negate the consensual nature of the encounter. *Id.*

Although no bright-line rule governs when a consensual encounter becomes a seizure, generally when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual. *Woodard*, 341 S.W.3d at 411. A Fourth Amendment seizure occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Garcia-Cantu*, 253 S.W.3d at 242; *see also Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (holding that a Fourth Amendment seizure occurs when there is governmental termination of freedom of movement through means intentionally applied). If it were an

option to ignore the request or terminate the interaction, then a Fourth Amendment seizure has not occurred. *Woodard*, 341 S.W.3d at 411. The surrounding circumstances, including time and place, are taken into account, but the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure. *Id.*

B

Johnson asserts that when a marked police unit moves to block the forward movement of a vehicle and then uses the marked patrol unit's spotlight to shine directly inside the blocked vehicle, under an "objective review of the evidence" the blocked vehicle is seized and at that moment the police must have reasonable articulable suspicion to justify that seizure. Johnson maintains that *Crain* and *Garcia-Cantu* support this conclusion. In *Crain*, the Court of Criminal Appeals held that a detention occurred when an officer shined his vehicle's spotlight on the defendant, who was walking across a yard, and called out to him to "come over here and talk to me" in a tone that the officer admitted sounded like an order. *See* 315 S.W.3d at 52 & n.39. In *Garcia-Cantu*, the Court of Criminal Appeals held that a detention occurred when an officer blocked the defendant's exit with his patrol car, turned on a spotlight, approached the defendant's truck while holding a long flashlight saying, "What are you doing here?" in a commanding tone of voice and standing toe-to-toe with the defendant while shining the flashlight into the defendant's eyes. *See* 253 S.W.3d at 248–49. Conversely, the State maintains that this case is more analogous to *Castleberry*, in which the Court of Criminal Appeals held that an officer approaching a defendant in the early morning and asking for identification and information was a consensual encounter. *See* 332 S.W.3d at 468.

The Court of Criminal Appeals has emphasized that there is no bright-line rule to determine when an encounter becomes a seizure. S*ee Garcia-Cantu*, 253 S.W.3d at 243. Instead, we must take into account the totality of the circumstances surrounding the interaction to determine whether a reasonable person would have felt free to ignore the

7

police officer's request or terminate the encounter. *Castleberry*, 332 S.W.3d at 467. Among the factors that may indicate a seizure would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Crain*, 315 S.W.3d at 49–50 (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980)). The Court of Criminal Appeals has also stated that although the use of a police vehicle's spotlight alone is not enough to lead a reasonable person to think he is not free to go, the use of the spotlight is a factor to be considered in the totality-of-the-circumstances assessment and, combined with other circumstances, may well establish a Fourth Amendment detention. *Id.* at 51. The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. *Id.*; *Garcia-Cantu*, 253 S.W.3d at 243–44. Whether an encounter between police officers and a person in a car constitutes a seizure depends on specific facts as to the manner of the encounter, the degree of authority displayed, and all other circumstances surrounding the incident. *Garcia-Cantu*, 253 S.W.3d at 244.

Johnson's argument rests on his characterization of the evidence, which he contends indisputably shows that Hendrie blocked Johnson's vehicle, shined his spotlight into the vehicle, and "authoritatively called out" to Johnson to produce identification. But although Hendrie's use of the spotlight was undisputed, whether Hendrie blocked Johnson's car with his police vehicle and whether Hendrie merely asked Johnson to produce identification or "authoritatively" commanded him to do so were subjects of conflicting testimony. When the trial court does not make explicit findings of fact, we must view all of the evidence in the light most favor able to the trial court's ruling and infer the necessary factual findings that support the trial court's ruling if the record evidence supports these implied fact findings. *Garcia-Cantu*, 253 S.W.3d at 241. We afford almost total deference to the trial court's determination of the historical facts that the record supports, especially when its implicit fact-finding is based on an evaluation of

8

credibility and demeanor. *Garcia-Cantu*, 253 S.W.3d at 241*; Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). As the *Garcia-Cantu* court instructed, "the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Garcia-Cantu*, 253 S.W.3d at 241. Thus, even though the *Garcia-Cantu* court held there was a detention based on the trial court's finding that the arresting officer had blocked in the defendant's vehicle and prevented him from leaving, the court made a point of explaining that if the trial court had ruled in favor of the State and against the appellee, the totality of the circumstances and the credibility of the witnesses also would have supported a fact-finding that the appellee was free to leave in his vehicle if he so chose. *Id.* at 246, 249–50.

In a reply brief, however, Johnson argues that we may not conclude the trial court made implicit findings supporting a conclusion that the encounter was consensual rather than an investigative detention. According to Johnson, the trial court resolved the "detention issue" against the State when it "found" at the conclusion of the hearing, "I do believe that the officer acted reasonably under the circumstances and did have articulable facts that justified the minimal detention."[3] Because the court called the incident a "detention," Johnson contends, neither implicit nor explicit findings can support the State's "consensual encounter" arguments. In other words, Johnson maintains that the trial court resolved the detention issue in his favor, but determined that the detention was reasonable. Accordingly, Johnson maintains, we should not afford the State the strongest legitimate view of the evidence. We disagree. If the trial judge's decision is correct on any theory of law applicable to the case, it will be sustained, even when the trial judge

---

[3] Although the trial court stated the basis for its ruling, it did not provide any essential findings adequate to provide this court with a basis upon which to review the trial court's application of the law to the facts. *See State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011); *Cullen*, 195 S.W.3d at 699. Further, Johnson did not request findings of fact and conclusions of law. When a losing party to a motion to suppress does not request for findings of fact and conclusions of law and none are made, *Ross* controls and the appellate court views the evidence in the light most favorable to the trial court's ruling. *Cullen*, 195 S.W.3d at 699; *Ross*, 32 S.W.3d at 855–56.

9

gives the wrong reason for his decision. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Brooks v. State*, 76 S.W.3d 426, 434 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Thus, even if the trial court stated an incorrect reason for denying the motion to suppress, we may sustain its ruling on separate grounds. *Brooks*, 76 S.W.3d at 434.

Based on the evidence presented here, the trial court could have determined that Hendrie's testimony was more credible than Johnson's concerning the tenor of Hendrie's initial interaction with Johnson, and reasonably concluded that, when Hendrie approached Johnson's car, he asked Johnson "What's going on, what are you doing here?' and requested to see Johnson's identification. An officer may, without reasonable suspicion, request identification and information from a citizen. *Castleberry*, 332 S.W.3d at 466. Hendrie acknowledged he spoke in a loud voice that "maybe" sounded "authoritative," but the trial court could have found that Hendrie's overall tone and demeanor reflected that Hendrie was merely requesting information from Johnson, rather than commanding him to obey an order, as was the case in *Crain*, and he spoke at a volume appropriate for communicating with a person in a parked car. And although Johnson claimed that Hendrie positioned his police vehicle in a way that prevented him from leaving, Hendrie testified that his vehicle at most only partially blocked Johnson's car, and that Johnson could have maneuvered around it. The Court of Criminal Appeals has noted that "when an officer only partially blocks a parked car or merely makes it somewhat inconvenient for the citizen to depart voluntarily, such action is not necessarily, by itself, sufficient to constitute a Fourth Amendment detention." *Garcia-Cantu*, 253 S.W.3d at 246 n.44.

In summary, viewed in the light most favorable to the trial court's ruling, the evidence supports implicit findings that during the initial interaction between Johnson and Hendrie (1) Hendrie approached Johnson's vehicle, which was backed into a parking spot outside the gate of an apartment complex at night with its lights on and engine

10

running; (2) Hendrie parked his police vehicle at an angle that partially blocked Johnson's egress but did not prevent him from maneuvering around him and driving away; (3) Hendrie shined his police vehicle's spotlight inside Johnson's car; (4) Hendrie did not activate his siren or emergency lights, or use a bullhorn or loudspeaker to communicate with Johnson; (5) Hendrie approached Johnson's car and asked, "What's going on, what are you doing out here?" and requested Johnson's identification; and (6) Hendrie did not carry a flashlight, draw a weapon, order Johnson to put his hands up, or otherwise inform him that he was being detained. On these facts, the trial court could have concluded that a reasonable person in Johnson's position would have believed that he was free to ignore Hendrie's requests or terminate the interaction, and therefore the initial interaction between Hendrie and Johnson was a voluntary encounter rather than a Fourth Amendment seizure. *See Castleberry*, 332 S.W.3d at 462, 468 (holding officer's initial interaction was a consensual encounter rather than a detention when officer approached defendant and another man, asked them for identification, and questioned them as to why they were walking behind a closed business at night); *see also Hughes v. State*, 337 S.W.3d 297, 302 (Tex. App.—Texarkana 2011, no pet.) (holding initial interaction between police officer and defendant was an encounter and not an investigative detention, when the position of the officer's car relative to the defendant's vehicle did not prevent the defendant from leaving and the officer's activation of the police car's spotlight, rather than the car's red emergency lights, did not demonstrate a command to stop); *State v. Priddy*, 321 S.W.3d 82, 87–88 (Tex. App.—Fort Worth 2010, pet. ref'd) (holding officer's initial interaction was a voluntary encounter rather than a seizure, when the officer activated his spotlight and indicated that defendant, who was eating a hamburger in a parked car with the engine running, needed to roll down her window, and the officer did not activate the patrol car's overhead lights or siren, block her egress, or engage in any activity that indicated that that defendant was being detained or was not free to terminate the encounter).

11

During the consensual encounter, Hendrie noticed the smell of marijuana. The odor of marijuana alone provides reasonable suspicion for an investigatory detention and probable cause to search a vehicle without a warrant. *See Isam v. State*, 582 S.W.2d 441, 444 (Tex. Crim. App. 1979); *Razo v. State*, 577 S.W.2d 709, 711 (Tex. Crim. App. 1979); *Taylor v. State* 20 S.W.3d 51, 56 (Tex. App.—Texarkana 2000, pet. ref'd). Thus, the initial encounter developed into a valid temporary detention and Hendrie's actions in detaining Johnson at that point and looking inside the vehicle were justified by the smell of the marijuana in Johnson's car. *See Woodard*, 341 S.W.3d at 409. Johnson does not challenge the officer's actions after he smelled the odor of marijuana coming from inside Johnson's car.[4]

Based on the foregoing, we conclude the trial court did not abuse its discretion in denying Johnson's motion to suppress. We therefore overrule Johnson's issue.

\* \* \*

We affirm the trial court's judgment.

/s/ Jeffrey V. Brown
Justice

Panel consists of Justices Brown, Boyce, and McCally. (McCally, J., concurring).

Publish — TEX. R. APP. P. 47.2(b).

---

[4] In his reply brief, Johnson states, "The fact that reasonable suspicion may have existed after Sgt[.] Hendrie's initial detention is not at issue."

12