IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0209-12





JACKIE JOHNSON, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTEENTH COURT OF APPEALS


HARRIS COUNTY





 Johnson, J., delivered the opinion of the Court in which Meyers, Price,
Womack, and Cochran, JJ., joined. Keller, P. J., filed a concurring opinion in which
Keasler, and Hervey, JJ., joined. Price, J., filed a concurring opinion in which
Womack, J., joined. Alcalá, J., did not participate. 


O P I N I O N



 Appellant's motion to suppress asserted that: his seizure was made without any reasonable
suspicion that he was engaged in any criminal activity or breach of the peace; acquisition of the
evidence that would be offered by the state was not pursuant to a reasonable investigative detention
or pursuant to an arrest warrant; no exigent circumstances existed; and the arrest was made without
probable cause to believe appellant was engaged in criminal activity. It also alleged that the search
was in violation of the laws of this state and of the United States Constitution. After a hearing, the
trial court denied the motion. (1) In making that ruling, the trial judge specifically found that appellant
had been detained, saying that she believed that "the officer acted reasonably under the
circumstances and did have articulable facts that justified the minimal detention," but also denied
appellant's motion to suppress. Appellant then plead guilty to the misdemeanor offense of
possession of marijuana and, pursuant to a plea agreement, was sentenced to twenty days in jail. He
appealed the trial court's denial of his suppression motion. The court of appeals concluded that the
trial court did not abuse its discretion in denying the suppression motion and affirmed the trial
court's judgment. Johnson v. State, 359 S.W.3d 725 (Tex. App.--Houston [14th Dist.] 2011). We
granted review of appellant's petition to this Court. We sustain appellant's grounds for review (2) and
reverse and remand this cause to the court of appeals to determine whether the detention was valid.

I. Facts


 The record from the hearing on appellant's suppression motion reflects that an identified
complainant who was a resident of an apartment complex called 911 to report a suspicious
person--an unidentified black male who was sitting on the steps watching cars near her apartment,
number 309, which was near the rear of the complex and could not be seen from the front, and only, 
entrance to the complex. Her report included a description of that person and his clothing. (3) In
response to her call, a Houston Police Department officer went to the complex. The officer testified
that he had tried to contact the complainant by telephone but was unsuccessful and had made no
attempt to contact the resident in apartment 309 in person. He also testified that he was familiar with
the complex. According to the responding officer, the call slip indicated that "the guy was standing
out front of the leasing office," (4) so he drove past the leasing office but saw no one there. (5) 

 Seeing a vehicle with its lights on backed into one of the parking spaces beside the leasing
office, outside of the entrance gate but on the complex property, the officer shined his high-beam
spotlight "in the car" and saw appellant sitting in it. He conceded that appellant was parked legally. 
The spotlight, described by the officer as "[p]retty darn bright" and being "a big, big thick lamp,"
remained aimed at appellant's car throughout the ensuing events. The officer "pulled kind of on
the-the corner of his car. . . . Kind of parked catty-corner like that," but not "totally blocking it." The
officer and the court had a brief colloquy about the position of the police car.

 The court: . . . So is your vehicle blocking his?

 The witness: It's-it's in the way a little bit, but no-I wasn't totally blocking it, no.

 . . .

 The court: Could he have left if he had wanted to, or would your car have- 

 The witness: From what I remember, he could have probably maneuvered around me-

 The court: Okay.

 The witness: -manipulated around me, yeah.


 In response to the prosecutor's question as to what brought his attention to appellant's car,
the officer stated, "It was backed in. So I thought maybe it could be, you know, a get-away vehicle
or a get-away driver in there. Could be the suspect, you know, had just done a robbery and was
going to leave. So it was backed in. That's what brought my attention to it." The officer testified
that he continued to shine his patrol car's large spotlight on appellant's vehicle as he got out of his
own vehicle and spoke to appellant "us[ing] a loud authoritative voice maybe. I said a loud voice
so I could hear him. I was far away. I had to use an outside voice." The officer walked in front of
appellant's car, going first to the passenger side, then to the driver's side. Appellant matched the
description of the suspicious person in the call slip to the extent that he is a black male. His clothing
matched the complainant's description of the suspect in that he was wearing a dark shirt, but his
pants were also dark, not beige as described in the call slip, and he was not wearing a do rag or
anything else on his head. The officer testified that, during the course of that interaction, he smelled
a little bit of an odor of marijuana when he was at the passenger door and that the odor was quite
strong on the driver's side. But when the prosecutor asked the officer when he saw the marijuana,
the officer responded that he did not see the marijuana until he "asked [appellant] to step out of the
vehicle. And then I did a-I detained him. And then I looked in the car, and it was sitting on the front
console." 

 When questioned by defense counsel about the discrepancy between his testimony--he
smelled marijuana at the passenger door--and his offense report--no mention of smelling marijuana
at the passenger door or of the seized marijuana sitting on the front console in plain view, the officer
responded, "I don't write everything that happened out there in my police report. This is just to
refresh my memory when I come [to court]." The officer also testified that "it didn't seem to me that
[appellant] was" under the influence of either alcohol or marijuana, nor was there, in appellant's car,
any physical evidence, such as roaches, of marijuana having been smoked in the car. The officer
arrested appellant and charged him with misdemeanor possession of marijuana. After the arrest, the
officer confiscated from appellant's back seat a stun gun and a mask that "covers your nose and your
mouth and just your eyes showing." (6)

 On cross-examination, the officer appeared evasive and argumentative, resulting in two
defense requests to the trial court that the officer be instructed to answer the question that had
actually been asked instead of arguing with defense counsel. After the second request, the trial court
stated, "Just wait for the question, answer only the question that's posed." For example, the officer
was reluctant to concede that the call slip, Defense Exhibit 5, did not state a criminal offense,
repeatedly asserting what could have been going on--a robbery, a criminal trespass--rather the
words on the call slip that reflected merely a report of a suspicious person. After numerous attempts
and failures by defense counsel to obtain agreement that the call slip did not report a crime, the trial
court commented, "You're never going to get him to say it, but I can read."

 Although the officer continued to maintain that appellant could have just driven around him
and that appellant was not under arrest, he did testify that appellant had yielded to his authority.

 Q: But it's possible that you pulled your pistol out, also?

 A: It's possible. It's possible.

 Q: Basically what Mr. Johnson did is he-you know, you have the authority as a police officer
to command people to do certain things. You'd agree with me there, right?

 A: Correct.

 Q: And basically what he did that day is he yielded to your authority, didn't he? He followed
what you told him to do?

 A: Correct.

 

 Appellant presented the testimony of David Davis, a retired Department of Public Safety 
officer who had spent a total of 32 years in law enforcement. He testified that he had visited the
complex and taken photographs, the building numbers were easily seen, the majority of persons that
he saw on his daytime visit were young black males, and he had stood at the door to apartment 309
and could not see Building 700 or the leasing office. He also stated that he had transcribed the 911
tape, as he had done with "many, many" such tapes during his service as a peace officer, and that the
complainant on the tape had not reported a crime, only a suspicious person.

 The state challenged Davis as to the ability to see building numbers at night. Davis pointed
out, as had the responding officer, that police cars have large spotlights on them that would render
the building numbers easily readable. The state also posed a hypothetical: If, as an active officer,
he had received a report from an apartment complex of a suspicious person who was identified by
height, ethnicity, and clothing, what would he have done if he had gone to the reported location and
saw someone who matched the description? Davis answered, "I would go to the complainant, to the
proximity of the complainant, get more information, look in that-that direct area for this described
suspicious person." 

 The state added more information: "If the person was on foot, what would you do?" Davis
responded, "I would drive around the complex looking for someone that looked like him or walk
round the complex, whatever it required." The state continued, "So if you saw a person who was
walking around the complex and that matched the description, you would continue around looking
for other people? Is that what you're saying?" Davis answered, "I would go straight to the
complainant for information. If I saw that person, yes, I would check them out."

 Defense counsel posed another hypothetical. "[W]hen you pull up to somebody and you
intend to detain them and you're in a marked unit and you pull up to them with your vehicle within
10 feet or 5 feet and your car is pointing at them with a spotlight on them and you're the officer
that's doing that, did you intend for that person to leave? Davis answered, "What you described,
absolutely not." Defense counsel went on, "You-a person in that position, if you were that officer,
your intent was to keep that person detained until you decided what to do with that person; isn't that
correct?" Davis responded, "That's correct."

 After the parties made final arguments, the trial court ruled, "But I do believe that the officer
acted reasonably under the circumstances and did have articulable facts that justified the minimal
detention. So I am going to deny the Motion to Suppress."

 Appellant appealed the denial of his suppression motion. The sole issue he presented stated,
"The trial court erred in denying [his] motion to suppress." Specifically, appellant asserted that, in
concluding that a reasonable person in his position would have felt free to leave or terminate the
interaction with the police officer, the trial court's denial of his suppression motion was a clear abuse
of discretion.

II. Court of Appeals Opinion


 The court of appeals held that the proper standard of review was to consider the evidence in
the light most favorable to the trial court's ruling. After describing several pieces of evidence, it held
that the trial court could have concluded that the evidence supported its implicit findings and
conclusion that a reasonable person in appellant's position would have believed that he was free to
ignore the officer's requests or terminate the interaction, thus making the initial interaction a
consensual encounter rather than a Fourth Amendment seizure. Johnson, 359 S.W.3d at 733. The
court of appeals then concluded that the trial court did not abuse its discretion in denying the
suppression motion and affirmed the trial court's judgment. Id. at 733-34. 

III. Appellant's Grounds for Review


 We granted appellant's petition for discretionary review. Appellant's two grounds for review
assert that the court of appeals ignored the trial court's explicit finding on the record that there was
a detention in favor of its own implied finding that led it to conclude that the interaction was merely
a consensual encounter. Ground one asks whether the panel majority of the court of appeals
misconstrued and misapplied the standard of review dictated by this Court and the United States
Supreme Court "when it substitute[d] the trial court's explicit findings with the panel majority's
implicit findings and applied these substituted findings to the law to support [the] trial court's
ruling." Ground two asks whether the panel majority, in conflict with opinions of this Court and the
Supreme Court,

 err[ed] to infer from the record testimony that, notwithstanding the trial court's
finding to the contrary, the evidence demonstrates the trial court could have
concluded that a reasonable person in [appellant]'s position would have believed that
he was free to ignore [the officer]'s requests or terminate the interaction, and
therefore the initial interaction between [the officer] and [appellant] was a voluntary
encounter rather than a Fourth Amendment seizure?


IV. Arguments


 Appellant asserts that the court of appeals failed to accord the trial court's conclusions
appropriate deference. He points to the trial judge's statement that she believed that "the officer
acted reasonably under the circumstances and did have articulable facts that justified the minimal
detention." In light of that explicit finding of a detention, appellant questions the court of appeals's
holding, in spite of the trial court specifically finding otherwise, that his initial interaction with the
officer was a consensual encounter rather than a detention.

 The state argues that "[t]he trial court made no determination regarding when the detention
had occurred" and that appellant "did not request that the trial court make any specific findings of
fact." The state asserts that the court of appeals applied the proper standard of review when
evaluating the trial court's denial of appellant's suppression motion and properly affirmed that
denial. It contends that the trial court's ruling that appellant had been detained was a legal one that
was not entitled to any deference and that whether a detention has occurred should be determined
de novo by the court of appeals. It also notes that appellant, as the non-prevailing party, did not
request specific fact-findings, and the court of appeals therefore properly afforded the state the
strongest legitimate view of the evidence.

 The state also suggests that, if this Court regards the trial court's ruling as a form of fact
finding, the proper course of action would be to remand the case to the trial court for additional
findings. It adds that, while the evidence supports the court of appeals's determination that the initial
interaction was a consensual encounter, even if a detention is assumed, the officer had specific
articulable facts that justified the minimal detention involved in approaching the parked car and
asking for identification.

V. Analysis


 "The Fourth Amendment to the United States Constitution permits a warrantless detention
of a person, short of a full-blown custodial arrest, if the detention is justified by reasonable
suspicion." State v. Kerwick, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013), citing Terry v. Ohio,
392 U.S. 1, 28 (1968), and Derichsweiler v. State, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). 
It is undisputed that appellant's arrest was without a warrant.

 Police and citizens may engage in three distinct types of interactions: consensual encounters,
investigative detentions, and arrests. State v. Woodard, 341 S.W.3d 404, 411-12 (Tex. Crim. App.
2011). "Consensual police-citizen encounters do not implicate Fourth Amendment protections." Id.
at 411, citing Bostick v. Florida, 501 U.S. 429, 434 (1991), and Florida v. Rodriguez, 469 U.S. 1,
5-6 (1984). Detentions and arrests are Fourth Amendment seizures and therefore implicate Fourth
Amendment protections. State v. Castleberry, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). 
"[W]hen a seizure takes the form of a detention, Fourth Amendment scrutiny is necessary--it must
be determined whether the detaining officer had reasonable suspicion that the citizen is, has been,
or is about to be engaged in criminal activity." Id. (citations omitted).

 "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view the
evidence in the light most favorable to the trial court's ruling." State v. Garcia-Cantu, 253 S.W.3d
236, 241 (Tex. Crim. App. 2008). "When the trial court does not make explicit findings of fact, the
appellate court infers the necessary factual findings that support the trial court's ruling if the record
evidence (viewed in light most favorable to the ruling) supports these implied fact findings." Id. 
"When a trial court makes explicit fact findings, the appellate court determines whether the evidence
(viewed in the light most favorable to the trial court's ruling) supports these fact findings." Kelly v.
State, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Such motions are reviewed pursuant to a
bifurcated standard under which "[t]he trial judge's determinations of historical facts and mixed
questions of law and fact that rely on credibility are granted almost total deference when supported
by the record. But when mixed questions of law and fact do not depend on the evaluation of
credibility and demeanor, we review the trial judge's ruling de novo." Kerwick, 393 S.W.3d at 273,
citing Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

 The trial court's findings of fact and conclusions of law are sufficient if they are "recorded
in some way, whether written out and filed by the trial court, or stated on the record at the hearing."
State v. Cullen, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). The state concedes that, in ruling on
appellant's suppression motion, the trial judge indicated that a detention had occurred, but the state
nevertheless argues that detention is a question of law rather than of fact and that the appellate court
properly considered such a question of law de novo.

 Appellant's grounds for review concern the appellate standard of review. We must,
therefore, determine whether the court of appeals used the proper standard of review when it
considered the trial court's ruling on appellant's suppression motion.

 When the trial court denied the motion, it specifically ruled that a detention had occurred, i.e.,
the trial judge said that the officer acted reasonably and had articulable facts that justified the
"minimal detention." Nevertheless, the determination of detention, minimal or otherwise, was more
of a conclusion of law than a finding of fact. We have held that "the question of whether a given set
of historical facts amount to a consensual police-citizen encounter or a detention under the Fourth
Amendment . . . is an issue of law[.]" State v. Garcia-Cantu, 253 S.W.3d at 241. The application
of legal principles to a specific set of facts is an issue of law and is subject to de novo review. Id. 
Thus, whether the facts surrounding the officer and appellant's interaction constitute a consensual
police-citizen encounter or a Fourth Amendment detention is subject to de novo review. Castleberry,
332 S.W.3d at 466.

 The court of appeals erred when it viewed the evidence in the light most favorable to the trial
court's ultimate decision to deny appellant's suppression motion, instead of its determination as to
detention versus consensual encounter. The court of appeals properly noted that, when a trial court
does not make explicit findings of fact, it must review the evidence in the requisite light most
favorable to the trial court's ruling and infer the necessary factual findings that support the trial
court's ruling if the evidence supports those implied fact findings. Johnson, 359 S.W.3d at 731. 
After viewing the evidence pursuant to that standard, the court of appeals held that the evidence
supported the trial court's implicit finding that there was no detention, only a consensual encounter.
Id. at 733. But, as noted above, the question of detention versus encounter is a question of law that
must be reviewed de novo. 

 The court of appeals's review of the trial court's conclusion that a "minimal detention" had
occurred should have been de novo. The court of appeals's analysis included consideration of
several appropriate factors, including that the officer: 1) approached appellant's vehicle, which was
backed into a parking spot outside the gate of an apartment complex at night with its lights on and
engine running; 2) parked his police vehicle at an angle that at least partially blocked appellant's
egress but did not prevent him from "maneuvering" around the officer and driving away; 3) shined
his police vehicle's spotlight inside appellant's car; 4) did not activate his siren or emergency lights
or use a bullhorn or loudspeaker to communicate with appellant; 5) approached appellant's car and
asked, "What's going on, what are you doing out here?" and requested appellant's identification; and
6) did not carry a flashlight, draw a weapon, order appellant to put his hands up, or otherwise inform
appellant that he was being detained. Johnson, 359 S.W.3d at 733. We disagree, however, with the
appellate court's determination that appellant was not detained. We cannot conclude that, under the
totality of the circumstances in this case, a reasonable person would have felt free to leave; thus, this
case involved a detention rather than a consensual encounter.

 An investigative detention, which implicates Fourth Amendment protections, "occurs when
a person yields to the police officer's show of authority under a reasonable belief that he is not free
to leave." Crain v. State, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). In determining whether the
interaction constituted an encounter or a detention, courts focus on whether the officer conveyed a
message that compliance with the officer's request was required--"whether a reasonable person in
the citizen's position would have felt free to decline the officer's requests or otherwise terminate the
encounter." Id. We conclude that, under the totality of circumstances in the instant case, a
reasonable person would not have felt free to leave or decline the officer's requests.

 We point out that the officer's shining of a "pretty darn bright" high-beam spotlight onto a
person sitting in a parked vehicle, parking the police car in such a way as to at least partially block
the person's vehicle such that the person would have had to "maneuver" around the police car to
drive away, using a "loud authoritative voice" in speaking with the person, asking "what's going
on," and demanding identification manifests a detention, that is, an interaction that a reasonable
person would not feel free to terminate. While none of these circumstances individually would
necessarily lead to an inescapable conclusion that the person was detained, under the totality of these
circumstances, we conclude that appellant was indeed detained--perhaps when the officer shined
a bright light on him in his car, but certainly when the officer blocked appellant's car such that
appellant would have had to "maneuver" his car from its parking place if he wished to terminate the
interaction--thus implicating Fourth Amendment protections. On this record, the trial court could
not reasonably have concluded that a reasonable person in appellant's shoes would have felt free to
disregard the officer's approach, show of authority, and commands or felt free to terminate the
interaction.

VI. Conclusion


 We conclude that the court of appeals erred in its determination that appellant was not
detained. Accordingly, we reverse the judgment of the court of appeals and remand to that court for
consideration of the trial court's determination that the officer had reasonable suspicion to detain
appellant and to determine whether that detention was valid.



Delivered: December 11, 2013

Publish
1. Both the police officer and appellant testified at the hearing. Their testimonies conflicted as to some of the
details regarding the officer's actions, and the officer had to be admonished to answer counsel's questions instead of
arguing with him. 
2. "Did the panel majority of the Fourteenth Court of Appeals misconstrue and misapply the standard of review
dictated by the Texas Court of Criminal Appeals and the United States Supreme Court when it substituted the trial court's
explicit findings with the panel majority's implicit findings and applied these substituted findings to the law to support
[the] trial court's ruling?

 Did the Panel Majority, in conflict with opinions of the Texas Court of Criminal Appeals and decisions of the
United States Supreme Court, err to infer from the record testimony that, notwithstanding the trial court's finding to the
contrary, the evidence demonstrates the trial court could have concluded that a reasonable person in Johnson's position
would have believed that he was free to ignore officer Hendrie's requests or terminate the interaction, and therefore the
initial interaction between Hendrie and Johnson was a voluntary encounter rather than a Fourth Amendment seizure?"
3. 

 Operator: . . . What is the location of your emergency?

 Female caller: It's a[t] 12903 Brant Rock, Houston, Texas, 77082.

 Operator: Can you spell the street name for my records?

 Female caller: Brant Rock is b r a n t r o c k

 Operator: And what is the closest cross street at the corner of Brant Rock?

 Female caller: Westheimer

 Operator: Could it be Ashford Ham or Ashford Point?

 Female caller: Ashford Point

 Operator: OK is [it] going to be a house, apartment or business?

 Female caller: Apartment

 Operator: What is the apartment number we will be going to?

 Female caller: Ahh, 309

 Operator: 309 mam [sic]?

 Female caller: Uh ha, yes

 Operator: And what is the name of the apartments?

 Female caller: A, it is ahh Copper Cove

 Operator: And to insure proper police response I have a serious question I need to ask . . . What is your call
back number?

 Female caller: Sorry

 Operator: What is your call back number?

 Female caller: It's ahh [phone number].

 Operator: And what is your name?

 Female caller: [name] (name is inaudible)

 Operator: OK and what are you reporting mamm? [sic]

 Female caller: A we have a somebody that is downstairs, he's watching the people, watching the cars, and like
one year ago somebody that look like him ahh did something to our cars . . .

 Operator: OK so this is a person that is out in the parking lot?

 Female caller: Ah haa, yes

 Operator: OK are you aware, does he appear to have mental issues?

 Female caller: No

 Operator: OK . . . are there any weapons involved? Does he have any weapons on him that you are aware of?

 Female caller: No

 Operator: OK, is he white, black, or hispanic?

 Female caller: Black

 Operator: How tall is he mamm [sic]?

 Female caller: I can not tell you because he is seated in the stairs.

 Operator: Is he short, medium, medium height or tall?

 Female caller: He's tall.

 Operator: He's tall

 Female caller: Uhh huh

 Operator: OK, how much do you think he weighs?

 Female caller: Maybe like 23

 Operator: How much do you think he weighs, like what . . .

 Female caller: Ahh like, sorry, he's like maybe 160 pounds.

 Operator: And what is he wearing?

 Female caller: Sorry

 Operator: What is he wearing?

 Female caller: Ahh, it's a wearing ahh black t-shirt and that thing they put in their hair, I don't know what is
the name of that and ahh beige pants.

 Operator: Beige pants.

 Female caller: Uhh haa

 Operator: OK, a police unit will be dispatched to 12903 Brant Rock Drive. Now is he near your apartment or
is he ahh . . where is he near, is he near your . . . OK.

 Female caller: Yeaow . . he is in front of our apartment [sic], the apartment is 309 so he is going to be in the
complex 300.

 Operator: OK, a police unit will be dispatched to 12903 Brant Rock Drive, apartment number 309 in front of
the apartment, is this correct?

 Female caller: Yes, yes it is.

 Operator: Thank you mamm [sic] 

 Female caller: OK, bye.


Ding/computer voice: Monday, June 7, 2010, twenty three zero one and twenty two seconds.

Recording terminated
4. Call date: 06/07/10 . . . 

 Dispatch: 2331

Addr# 12903 Street: Brant Rock Dr Apt#: 309 Arrived: 2335

. . . Cleared: 0156

Bus: Copper Cove Apts Call Code: 3080

Call code description: suspicious person - weapons unkn: reporting a suspicious person(s). This does not appear to
involves [sic] mental issues. Unknown/no weapons are involved. Susp b/m . . . tall . . . 160 lbs . . . blk tshirt beig [sic]


Reportee: [name] Phn: [phone number] [end of call slip]
5. The officer also testified that there is one way into the complex and one way out, both located at the leasing
office. State's Exhibit 1 reveals that there is a small parking area next to the leasing office. Other parts of the complex
are accessed by internal streets with parking areas on the sides of those streets. Apartment 309 faced one of those
internal parking areas. 
6. Appellant testified that he had a stun gun because he had been robbed in the past. He was employed by
Pelican Worldwide, a molding and fabrication company, and the mask was the kind used to prevent inhalation of dust
and other debris that resulted from the company's activities.