

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0209-12

### JACKIE JOHNSON, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, and COCHRAN, JJ., joined. KELLER, P.J., filed a concurring opinion in which KEASLER, and HERVEY, JJ., joined. PRICE, J., filed a concurring opinion in which WOMACK, J., joined. ALCALÁ, J., did not participate.

### O P I N I O N

Appellant's motion to suppress asserted that: his seizure was made without any reasonable suspicion that he was engaged in any criminal activity or breach of the peace; acquisition of the evidence that would be offered by the state was not pursuant to a reasonable investigative detention or pursuant to an arrest warrant; no exigent circumstances existed; and the arrest was made without probable cause to believe appellant was engaged in criminal activity. It also alleged that the search was in violation of the laws of this state and of the United States Constitution. After a hearing, the

trial court denied the motion.[1] In making that ruling, the trial judge specifically found that appellant had been detained, saying that she believed that "the officer acted reasonably under the circumstances and did have articulable facts that justified the minimal detention," but also denied appellant's motion to suppress. Appellant then plead guilty to the misdemeanor offense of possession of marijuana and, pursuant to a plea agreement, was sentenced to twenty days in jail. He appealed the trial court's denial of his suppression motion. The court of appeals concluded that the trial court did not abuse its discretion in denying the suppression motion and affirmed the trial court's judgment. *Johnson v. State*, 359 S.W.3d 725 (Tex. App.—Houston [14th Dist.] 2011). We granted review of appellant's petition to this Court. We sustain appellant's grounds for review[2] and reverse and remand this cause to the court of appeals to determine whether the detention was valid.

## I. Facts

The record from the hearing on appellant's suppression motion reflects that an identified complainant who was a resident of an apartment complex called 911 to report a suspicious person—an unidentified black male who was sitting on the steps watching cars near her apartment, number 309, which was near the rear of the complex and could not be seen from the front, and only,

---

[1] Both the police officer and appellant testified at the hearing. Their testimonies conflicted as to some of the details regarding the officer's actions, and the officer had to be admonished to answer counsel's questions instead of arguing with him.

[2] "Did the panel majority of the Fourteenth Court of Appeals misconstrue and misapply the standard of review dictated by the Texas Court of Criminal Appeals and the United States Supreme Court when it substituted the trial court's explicit findings with the panel majority's implicit findings and applied these substituted findings to the law to support [the] trial court's ruling?

Did the Panel Majority, in conflict with opinions of the Texas Court of Criminal Appeals and decisions of the United States Supreme Court, err to infer from the record testimony that, notwithstanding the trial court's finding to the contrary, the evidence demonstrates the trial court could have concluded that a reasonable person in Johnson's position would have believed that he was free to ignore officer Hendrie's requests or terminate the interaction, and therefore the initial interaction between Hendrie and Johnson was a voluntary encounter rather than a Fourth Amendment seizure?"

entrance to the complex.  Her report included a description of that person and his clothing.[3]  In

Operator: . . . What is the location of your emergency?
Female caller: It's a[t] 12903 Brant Rock, Houston, Texas, 77082.
Operator: Can you spell the street name for my records?
Female caller: Brant Rock is b r a n t  r o c k
Operator: And what is the closest cross street at the corner of Brant Rock?
Female caller: Westheimer
Operator: Could it be Ashford Ham or Ashford Point?
Female caller: Ashford Point
Operator: OK is [it] going to be a house, apartment or business?
Female caller: Apartment
Operator: What is the apartment number we will be going to?
Female caller: Ahh, 309
Operator: 309 mam [sic]?
Female caller: Uh ha, yes
Operator: And what is the name of the apartments?
Female caller: A, it is ahh Copper Cove
Operator: And to insure proper police response I have a serious question I need to ask . . . What is your call back number?
Female caller: Sorry
Operator: What is your call back number?
Female caller: It's ahh  [phone number].
Operator: And what is your name?
Female caller:  [name] (name is inaudible)
Operator: OK and what are you reporting mamm? [sic]
Female caller: A we have a somebody that is downstairs, he's watching the people, watching the cars, and like one year ago somebody that look like him ahh did something to our cars . . .
Operator: OK so this is a person that is out in the parking lot?
Female caller: Ah haa, yes
Operator: OK are you aware, does he appear to have mental issues?
Female caller: No
Operator: OK . . . are there any weapons involved? Does he have any weapons on him that you are aware of?
Female caller: No
Operator: OK, is he white, black, or hispanic?
Female caller: Black
Operator: How tall is he mamm [sic]?
Female caller: I can not tell you because he is seated in the stairs.
Operator: Is he short, medium, medium height or tall?
Female caller: He's tall.
Operator: He's tall
Female caller: Uhh huh
Operator: OK, how much do you think he weighs?
Female caller: Maybe like 23
Operator: How much do you think he weighs, like what . . .
Female caller: Ahh like, sorry, he's like maybe 160 pounds.
Operator: And what is he wearing?
Female caller: Sorry
Operator: What is he wearing?
Female caller: Ahh, it's a wearing ahh black t-shirt and that thing they put in their hair, I don't know what is

response to her call, a Houston Police Department officer went to the complex. The officer testified that he had tried to contact the complainant by telephone but was unsuccessful and had made no attempt to contact the resident in apartment 309 in person. He also testified that he was familiar with the complex. According to the responding officer, the call slip indicated that "the guy was standing out front of the leasing office,"[4] so he drove past the leasing office but saw no one there.[5]

Seeing a vehicle with its lights on backed into one of the parking spaces beside the leasing office, outside of the entrance gate but on the complex property, the officer shined his high-beam spotlight "in the car" and saw appellant sitting in it. He conceded that appellant was parked legally. The spotlight, described by the officer as "[p]retty darn bright" and being "a big, big thick lamp,"

---

the name of that and ahh beige pants.
Operator: Beige pants.
Female caller: Uhh haa
Operator: OK, a police unit will be dispatched to 12903 Brant Rock Drive. Now is he near your apartment or is he ahh . . where is he near, is he near your . . . OK.
Female caller: Yeaow . . he is in front of our apartment [sic], the apartment is 309 so he is going to be in the complex 300.
Operator: OK, a police unit will be dispatched to 12903 Brant Rock Drive, apartment number 309 in front of the apartment, is this correct?
Female caller: Yes, yes it is.
Operator: Thank you mamm [sic]
Female caller: OK, bye.

Ding/computer voice: Monday, June 7, 2010, twenty three zero one and twenty two seconds.
Recording terminated

[4] Call date: 06/07/10 . . .

| | | | |
|---|---|---|---|
| | | | Dispatch: 2331 |
| Addr# 12903 Street: Brant Rock Dr | | Apt#: 309 | Arrived: 2335 |
| . . . | | | Cleared: 0156 |
| Bus: Copper Cove Apts | Call Code: 3080 | | |

Call code description: suspicious person - weapons unkn: reporting a suspicious person(s). This does not appear to involves [sic] mental issues. Unknown/no weapons are involved. Susp b/m . . . tall . . . 160 lbs . . . blk tshirt beig [sic]

Reportee: [name]      Phn: [phone number]           [end of call slip]

[5] The officer also testified that there is one way into the complex and one way out, both located at the leasing office. State's Exhibit 1 reveals that there is a small parking area next to the leasing office. Other parts of the complex are accessed by internal streets with parking areas on the sides of those streets. Apartment 309 faced one of those internal parking areas.

remained aimed at appellant's car throughout the ensuing events. The officer "pulled kind of on the–the corner of his car. . . . Kind of parked catty-corner like that," but not "totally blocking it." The officer and the court had a brief colloquy about the position of the police car.

> The court: . . . So is your vehicle blocking his?
> The witness: It's–it's in the way a little bit, but no–I wasn't totally blocking it, no.
> . . .
> The court: Could he have left if he had wanted to, or would your car have–
> The witness: From what I remember, he could have probably maneuvered around me–
> The court: Okay.
> The witness: –manipulated around me, yeah.

In response to the prosecutor's question as to what brought his attention to appellant's car, the officer stated, "It was backed in. So I thought maybe it could be, you know, a get-away vehicle or a get-away driver in there. Could be the suspect, you know, had just done a robbery and was going to leave. So it was backed in. That's what brought my attention to it." The officer testified that he continued to shine his patrol car's large spotlight on appellant's vehicle as he got out of his own vehicle and spoke to appellant "us[ing] a loud authoritative voice maybe. I said a loud voice so I could hear him. I was far away. I had to use an outside voice." The officer walked in front of appellant's car, going first to the passenger side, then to the driver's side. Appellant matched the description of the suspicious person in the call slip to the extent that he is a black male. His clothing matched the complainant's description of the suspect in that he was wearing a dark shirt, but his pants were also dark, not beige as described in the call slip, and he was not wearing a do rag or anything else on his head. The officer testified that, during the course of that interaction, he smelled a little bit of an odor of marijuana when he was at the passenger door and that the odor was quite strong on the driver's side. But when the prosecutor asked the officer when he saw the marijuana, the officer responded that he did not see the marijuana until he "asked [appellant] to step out of the

vehicle. And then I did a–I detained him. And then I looked in the car, and it was sitting on the front console."

When questioned by defense counsel about the discrepancy between his testimony—he smelled marijuana at the passenger door—and his offense report—no mention of smelling marijuana at the passenger door or of the seized marijuana sitting on the front console in plain view, the officer responded, "I don't write everything that happened out there in my police report. This is just to refresh my memory when I come [to court]." The officer also testified that "it didn't seem to me that [appellant] was" under the influence of either alcohol or marijuana, nor was there, in appellant's car, any physical evidence, such as roaches, of marijuana having been smoked in the car. The officer arrested appellant and charged him with misdemeanor possession of marijuana. After the arrest, the officer confiscated from appellant's back seat a stun gun and a mask that "covers your nose and your mouth and just your eyes showing."[6]

On cross-examination, the officer appeared evasive and argumentative, resulting in two defense requests to the trial court that the officer be instructed to answer the question that had actually been asked instead of arguing with defense counsel. After the second request, the trial court stated, "Just wait for the question, answer only the question that's posed." For example, the officer was reluctant to concede that the call slip, Defense Exhibit 5, did not state a criminal offense, repeatedly asserting what *could have* been going on—a robbery, a criminal trespass—rather the words on the call slip that reflected merely a report of a suspicious person. After numerous attempts and failures by defense counsel to obtain agreement that the call slip did not report a crime, the trial

---

[6] Appellant testified that he had a stun gun because he had been robbed in the past. He was employed by Pelican Worldwide, a molding and fabrication company, and the mask was the kind used to prevent inhalation of dust and other debris that resulted from the company's activities.

court commented, "You're never going to get him to say it, but I can read."

Although the officer continued to maintain that appellant could have just driven around him and that appellant was not under arrest, he did testify that appellant had yielded to his authority.

Q: But it's possible that you pulled your pistol out, also?
A: It's possible. It's possible.
Q: Basically what Mr. Johnson did is he–you know, you have the authority as a police officer to command people to do certain things. You'd agree with me there, right?
A: Correct.
Q: And basically what he did that day is he yielded to your authority, didn't he? He followed what you told him to do?
A: Correct.

Appellant presented the testimony of David Davis, a retired Department of Public Safety officer who had spent a total of 32 years in law enforcement. He testified that he had visited the complex and taken photographs, the building numbers were easily seen, the majority of persons that he saw on his daytime visit were young black males, and he had stood at the door to apartment 309 and could not see Building 700 or the leasing office. He also stated that he had transcribed the 911 tape, as he had done with "many, many" such tapes during his service as a peace officer, and that the complainant on the tape had not reported a crime, only a suspicious person.

The state challenged Davis as to the ability to see building numbers at night. Davis pointed out, as had the responding officer, that police cars have large spotlights on them that would render the building numbers easily readable. The state also posed a hypothetical: If, as an active officer, he had received a report from an apartment complex of a suspicious person who was identified by height, ethnicity, and clothing, what would he have done if he had gone to the reported location and saw someone who matched the description? Davis answered, "I would go to the complainant, to the proximity of the complainant, get more information, look in that–that direct area for this described

suspicious person."

The state added more information: "If the person was on foot, what would you do?" Davis responded, "I would drive around the complex looking for someone that looked like him or walk round the complex, whatever it required." The state continued, "So if you saw a person who was walking around the complex and that matched the description, you would continue around looking for other people? Is that what you're saying?" Davis answered, "I would go straight to the complainant for information. If I saw that person, yes, I would check them out."

Defense counsel posed another hypothetical. "[W]hen you pull up to somebody and you intend to detain them and you're in a marked unit and you pull up to them with your vehicle within 10 feet or 5 feet and your car is pointing at them with a spotlight on them and you're the officer that's doing that, did you intend for that person to leave? Davis answered, "What you described, absolutely not." Defense counsel went on, "You–a person in that position, if you were that officer, your intent was to keep that person detained until you decided what to do with that person; isn't that correct?" Davis responded, "That's correct."

After the parties made final arguments, the trial court ruled, "But I do believe that the officer acted reasonably under the circumstances and did have articulable facts that justified the minimal detention. So I am going to deny the Motion to Suppress."

Appellant appealed the denial of his suppression motion. The sole issue he presented stated, "The trial court erred in denying [his] motion to suppress." Specifically, appellant asserted that, in concluding that a reasonable person in his position would have felt free to leave or terminate the interaction with the police officer, the trial court's denial of his suppression motion was a clear abuse of discretion.

## II. Court of Appeals Opinion

The court of appeals held that the proper standard of review was to consider the evidence in the light most favorable to the trial court's ruling. After describing several pieces of evidence, it held that the trial court could have concluded that the evidence supported its implicit findings and conclusion that a reasonable person in appellant's position would have believed that he was free to ignore the officer's requests or terminate the interaction, thus making the initial interaction a consensual encounter rather than a Fourth Amendment seizure. *Johnson*, 359 S.W.3d at 733. The court of appeals then concluded that the trial court did not abuse its discretion in denying the suppression motion and affirmed the trial court's judgment. *Id.* at 733-34.

## III. Appellant's Grounds for Review

We granted appellant's petition for discretionary review. Appellant's two grounds for review assert that the court of appeals ignored the trial court's explicit finding on the record that there was a detention in favor of its own implied finding that led it to conclude that the interaction was merely a consensual encounter. Ground one asks whether the panel majority of the court of appeals misconstrued and misapplied the standard of review dictated by this Court and the United States Supreme Court "when it substitute[d] the trial court's explicit findings with the panel majority's implicit findings and applied these substituted findings to the law to support [the] trial court's ruling." Ground two asks whether the panel majority, in conflict with opinions of this Court and the Supreme Court,

> err[ed] to infer from the record testimony that, notwithstanding the trial court's finding to the contrary, the evidence demonstrates the trial court could have concluded that a reasonable person in [appellant]'s position would have believed that he was free to ignore [the officer]'s requests or terminate the interaction, and therefore the initial interaction between [the officer] and [appellant] was a voluntary

encounter rather than a Fourth Amendment seizure?

## IV. Arguments

Appellant asserts that the court of appeals failed to accord the trial court's conclusions appropriate deference. He points to the trial judge's statement that she believed that "the officer acted reasonably under the circumstances and did have articulable facts that justified the minimal detention." In light of that explicit finding of a detention, appellant questions the court of appeals's holding, in spite of the trial court specifically finding otherwise, that his initial interaction with the officer was a consensual encounter rather than a detention.

The state argues that "[t]he trial court made no determination regarding when the detention had occurred" and that appellant "did not request that the trial court make any specific findings of fact." The state asserts that the court of appeals applied the proper standard of review when evaluating the trial court's denial of appellant's suppression motion and properly affirmed that denial. It contends that the trial court's ruling that appellant had been detained was a legal one that was not entitled to any deference and that whether a detention has occurred should be determined *de novo* by the court of appeals. It also notes that appellant, as the non-prevailing party, did not request specific fact-findings, and the court of appeals therefore properly afforded the state the strongest legitimate view of the evidence.

The state also suggests that, if this Court regards the trial court's ruling as a form of fact finding, the proper course of action would be to remand the case to the trial court for additional findings. It adds that, while the evidence supports the court of appeals's determination that the initial interaction was a consensual encounter, even if a detention is assumed, the officer had specific articulable facts that justified the minimal detention involved in approaching the parked car and

asking for identification.

**V. Analysis**

"The Fourth Amendment to the United States Constitution permits a warrantless detention of a person, short of a full-blown custodial arrest, if the detention is justified by reasonable suspicion." *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013), *citing Terry v. Ohio*, 392 U.S. 1, 28 (1968), and *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). It is undisputed that appellant's arrest was without a warrant.

Police and citizens may engage in three distinct types of interactions: consensual encounters, investigative detentions, and arrests. *State v. Woodard*, 341 S.W.3d 404, 411-12 (Tex. Crim. App. 2011). "Consensual police-citizen encounters do not implicate Fourth Amendment protections." *Id*. at 411, *citing Bostick v. Florida*, 501 U.S. 429, 434 (1991), and *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984). Detentions and arrests are Fourth Amendment seizures and therefore implicate Fourth Amendment protections. *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). "[W]hen a seizure takes the form of a detention, Fourth Amendment scrutiny is necessary—it must be determined whether the detaining officer had reasonable suspicion that the citizen is, has been, or is about to be engaged in criminal activity." *Id*. (citations omitted).

"In reviewing a trial court's ruling on a motion to suppress, appellate courts must view the evidence in the light most favorable to the trial court's ruling." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). "When the trial court does not make explicit findings of fact, the appellate court infers the necessary factual findings that support the trial court's ruling if the record evidence (viewed in light most favorable to the ruling) supports these implied fact findings." *Id*. "When a trial court makes explicit fact findings, the appellate court determines whether the evidence

(viewed in the light most favorable to the trial court's ruling) supports these fact findings." *Kelly v. State*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Such motions are reviewed pursuant to a bifurcated standard under which "[t]he trial judge's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record. But when mixed questions of law and fact do not depend on the evaluation of credibility and demeanor, we review the trial judge's ruling *de novo*." *Kerwick*, 393 S.W.3d at 273, *citing Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

The trial court's findings of fact and conclusions of law are sufficient if they are "recorded in some way, whether written out and filed by the trial court, or stated on the record at the hearing." *State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). The state concedes that, in ruling on appellant's suppression motion, the trial judge indicated that a detention had occurred, but the state nevertheless argues that detention is a question of law rather than of fact and that the appellate court properly considered such a question of law *de novo*.

Appellant's grounds for review concern the appellate standard of review. We must, therefore, determine whether the court of appeals used the proper standard of review when it considered the trial court's ruling on appellant's suppression motion.

When the trial court denied the motion, it specifically ruled that a detention had occurred, *i.e.*, the trial judge said that the officer acted reasonably and had articulable facts that justified the "minimal detention." Nevertheless, the determination of detention, minimal or otherwise, was more of a conclusion of law than a finding of fact. We have held that "the question of whether a given set of historical facts amount to a consensual police-citizen encounter or a detention under the Fourth Amendment . . . is an issue of law[.]" *State v. Garcia-Cantu*, 253 S.W.3d at 241. The application

of legal principles to a specific set of facts is an issue of law and is subject to *de novo* review. *Id*. Thus, whether the facts surrounding the officer and appellant's interaction constitute a consensual police-citizen encounter or a Fourth Amendment detention is subject to *de novo* review. *Castleberry*, 332 S.W.3d at 466.

The court of appeals erred when it viewed the evidence in the light most favorable to the trial court's ultimate decision to deny appellant's suppression motion, instead of its determination as to detention versus consensual encounter. The court of appeals properly noted that, when a trial court does not make explicit findings of fact, it must review the evidence in the requisite light most favorable to the trial court's ruling and infer the necessary factual findings that support the trial court's ruling if the evidence supports those implied fact findings. *Johnson*, 359 S.W.3d at 731. After viewing the evidence pursuant to that standard, the court of appeals held that the evidence supported the trial court's implicit finding that there was no detention, only a consensual encounter. *Id*. at 733. But, as noted above, the question of detention versus encounter is a question of law that must be reviewed *de novo*.

The court of appeals's review of the trial court's conclusion that a "minimal detention" had occurred should have been *de novo*. The court of appeals's analysis included consideration of several appropriate factors, including that the officer: 1) approached appellant's vehicle, which was backed into a parking spot outside the gate of an apartment complex at night with its lights on and engine running; 2) parked his police vehicle at an angle that at least partially blocked appellant's egress but did not prevent him from "maneuvering" around the officer and driving away; 3) shined his police vehicle's spotlight inside appellant's car; 4) did not activate his siren or emergency lights or use a bullhorn or loudspeaker to communicate with appellant; 5) approached appellant's car and

asked, "What's going on, what are you doing out here?" and requested appellant's identification; and 6) did not carry a flashlight, draw a weapon, order appellant to put his hands up, or otherwise inform appellant that he was being detained. *Johnson*, 359 S.W.3d at 733. We disagree, however, with the appellate court's determination that appellant was not detained. We cannot conclude that, under the totality of the circumstances in this case, a reasonable person would have felt free to leave; thus, this case involved a detention rather than a consensual encounter.

An investigative detention, which implicates Fourth Amendment protections, "occurs when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave." *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). In determining whether the interaction constituted an encounter or a detention, courts focus on whether the officer conveyed a message that compliance with the officer's request was required—"whether a reasonable person in the citizen's position would have felt free to decline the officer's requests or otherwise terminate the encounter." *Id*. We conclude that, under the totality of circumstances in the instant case, a reasonable person would not have felt free to leave or decline the officer's requests.

We point out that the officer's shining of a "pretty darn bright" high-beam spotlight onto a person sitting in a parked vehicle, parking the police car in such a way as to at least partially block the person's vehicle such that the person would have had to "maneuver" around the police car to drive away, using a "loud authoritative voice" in speaking with the person, asking "what's going on," and demanding identification manifests a detention, that is, an interaction that a reasonable person would not feel free to terminate. While none of these circumstances individually would necessarily lead to an inescapable conclusion that the person was detained, under the totality of these circumstances, we conclude that appellant was indeed detained—perhaps when the officer shined

a bright light on him in his car, but certainly when the officer blocked appellant's car such that appellant would have had to "maneuver" his car from its parking place if he wished to terminate the interaction—thus implicating Fourth Amendment protections. On this record, the trial court could not reasonably have concluded that a reasonable person in appellant's shoes would have felt free to disregard the officer's approach, show of authority, and commands or felt free to terminate the interaction.

## VI. Conclusion

We conclude that the court of appeals erred in its determination that appellant was not detained. Accordingly, we reverse the judgment of the court of appeals and remand to that court for consideration of the trial court's determination that the officer had reasonable suspicion to detain appellant and to determine whether that detention was valid.

Delivered: December 11, 2013
Publish