**REVERSE and REMAND; Opinion Filed July 31, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01607-CR

### THE STATE OF TEXAS, Appellant
### V.
### AMY LYONS, Appellee

**On Appeal from the County Criminal Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. MA13-34796**

## OPINION

Before Justices Lang, Myers, and Brown
Opinion by Justice Myers

Appellee Amy Lyons was charged with driving while intoxicated (DWI) and subsequently filed a motion to suppress, arguing that evidence was obtained through "an illegal stop/detention." The trial court granted the motion. The State appeals the trial court's order, contending the trial court erred by granting the motion to suppress. We reverse and remand.

### BACKGROUND AND PROCEDURAL HISTORY

Irving Police Officer Khanh Quach testified that on May 26, 2013, at approximately 2:40 a.m., he received a dispatch to a location on Highway 161, the President George Bush turnpike, to assist the DPS on "[a] possible DWI." According to the "call notes," the dispatch concerned "a vehicle with two deflated tires." Officer Quach proceeded to that location.

Based on the video footage from the police car's dashboard camera, which was introduced at the suppression hearing, and the officer's testimony at the hearing, upon arriving at

the scene, Officer Quach pulled his patrol car behind a North Texas Tollway Authority (NTTA) truck that was parked on the shoulder of the road behind a white Chevy SUV. Officer Quach did not have his overhead emergency lights activated and was, at that point, the only officer on the scene. In the video, Officer Quach exits his patrol car and walks up to NTTA truck driver. He asks, "Is this the DWI, or is there another one?" The NTTA driver—he was never identified by name and did not testify at the suppression hearing—can be heard saying "she got two flats," but the rest of his response is inaudible. Officer Quach testified that the NTTA driver told him appellee "had shown signs of intoxication, and he told me that she had two blown-out tires." Officer Quach also recalled, "If I remember right from the video, he said that she smelled—she had carried the odor of alcohol."

The next voice that is distinctly heard in the video is the officer asking, "You got DPS coming out here?" Officer Quach also asks: "Can you confirm? If not, I'll take it." In the background, the NTTA driver says, "She doesn't know what happened to her car." The officer asks the NTTA driver if the SUV hit something. The NTTA driver then says, "[S]he must hit something [sic]," but the rest of his response is inaudible. The officer asks, "Two flats?" The NTTA driver's response is, again, inaudible. Officer Quach tells the dispatcher that "[t]here's no DPS officers out here."

Officer Quach walks past the NTTA truck and approaches the SUV. His weapon is not drawn, but he can be seen in the video holding a flashlight in his hand. At the suppression hearing, he testified that when he walked up to the vehicle, appellee was sitting in the driver's seat, the keys were in the ignition, and the engine was running. In the video, Officer Quach can be heard asking appellee, "You okay, Ma'am?" She responds, "Yeah, I'm . . . , at which point the officer interjects, "What happened?" Appellee says, "My tire blew out." The officer asks, "Your tire blew out? Which one?" Appellee's response to this question is inaudible. The

officer then asks, "On which side?" Appellee says, "It's one of those." The officer replies, "Okay, give me a second." Officer Quach testified at the hearing that as he "contacted" appellee, he "also smelled the odor of alcohol" and "noticed that she was slurring" her speech, and then he "asked her to step out of the vehicle at that point."

In the video, after speaking to appellee, Officer Quach can be heard telling the NTTA driver, "We'll take it." When another officer arrives, Officer Quach speaks to him briefly and says, "Hey, I'm going to take this DWI, unless you want it." After the other officer drives away, Officer Quach drives his patrol car around the NTTA truck and parks on the shoulder of the road behind appellee's vehicle.[1] He walks back to the driver's side of the SUV, opens the door, and asks appellee, "Okay, do you know what you hit or anything?" Appellee says, "I don't know. It's just like my tire blew out." Officer Quach replies, "Okay, you're not hurt or anything?" Appellee says "no." The officer says, "Okay," after which he asks appellee where she was coming from. She replies, "Just from, uh, up north." The officer asks: "Up north? Okay, like Oklahoma north?" Appellee says "no." The officer asks, "Where at?" Appellee says, "We were coming from Buffalo Wild Wings." The officer asks appellee if she would mind stepping out of her vehicle to talk to him, and that he did not want to stand next to her vehicle given the traffic on the highway. Officer Quach administered field sobriety tests, after which he placed appellee under arrest for DWI.

Officer Quach testified at the suppression hearing that he did not see appellee driving or see the tire blowout, nor did the NTTA driver. The NTTA driver saw appellee's vehicle on the side of the road. Officer Quach testified that the reason for approaching appellee's car was the NTTA driver's report of a possible intoxicated driver. The trial court was skeptical of the State's

---

[1] The video recording shows that the NTTA truck's overhead lights were flashing and that when the second Irving police officer arrived on the scene, his patrol car's emergency lights were also flashing.

case, stating it needed more than a conclusory statement "that [appellee is] intoxicated" to find the detention was lawful. But the court withheld ruling and passed the case to give the parties one week to research and locate supporting authority for their positions.

When the hearing reconvened one week later, the trial court heard arguments and legal authorities from both sides. The State argued the encounter between appellee and Officer Quach was consensual, not a detention.[2] The State conceded the community caretaking exception to the warrant requirement was inapplicable. *See, e.g., Diaz v. State*, No. 05–12–00624–CR, 2013 WL 1614745, at \*1 (Tex. App.—Dallas April 11, 2013, no pet.) (not designated for publication) (stating that "community caretaking" exception to the warrant requirement provided that "a police officer may stop and assist an individual whom a reasonable person, given the totality of the circumstances, would believe is in need of help"). Counsel for appellee argued appellee had been subjected to a detention that was not supported by specific, articulable facts.

The trial court found it was Officer Quach's intent to conduct a DWI investigation prior to his initial contact with appellee. The trial court also found that, from the officer's perspective, appellee was not free to leave. The court stated on the record:

> So, I think from the officer's state of mind, while he was never specifically asked, . . . is he [sic] free to leave or not, it would appear to me that from the officer's testimony that "I am approaching this person to investigate a driving while intoxicated case and not to see if she was okay," that it would appear from the officer's state of mind that she wasn't free to leave.

---

[2] The State cited *State v. Priddy*, 321 S.W.3d 82 (Tex. App.—Fort Worth 2010, pet. ref'd), where the court of appeals reversed a trial court's grant of a motion to suppress and concluded the police officer's initial encounter with Priddy was a consensual police-citizen encounter that transitioned into an investigative detention supported by reasonable suspicion. *Id*. at 87-88. In that case, the police received a dispatch from an unidentified person at a hospital who said that the defendant had just left the hospital and appeared to be intoxicated. *Id*. at 84. The person also provided the defendant's name, address, the make of her vehicle, and the location and direction of her departure. *Id*. The officer located the defendant's vehicle about fifteen minutes later in a business area; the vehicle was legally parked but still running with its lights on. *Id*. The officer parked behind the defendant's vehicle, turned his spotlight on, and ran the vehicle's license tags. *Id*. When the officer approached the defendant's vehicle, he saw the defendant inside "laid over the seat," eating a hamburger. *Id*. When the defendant saw the officer she sat up and rolled down the window, after which the officer smelled the odor of an alcoholic beverage and observed that the defendant had glazed and bloodshot eyes. *Id*. The court of appeals concluded that the officer's initial interaction was not illegal because he had not engaged in a show of authority that would lead a reasonable person to believe she was not free to terminate the encounter. *Id*. at 87–88. The court also concluded that once the defendant rolled down her window and the officer noticed her glazed and bloodshot eyes and smelled the odor of an alcoholic beverage, "the voluntary encounter became an investigative detention based upon reasonable suspicion that [the defendant] had been driving while intoxicated." *Id*. at 88.

–4–

And I also find factual difference—I find some significance that an NTTA officer was already there.[3] So if we were just concerned about taking care of her disabled car and her situation, there was already someone there to do that, that it would be pretty clear, I think, to everyone, including the Defendant, that the police were here for some other reason than to see if she was okay, because there was already someone there to take care of those matters.

So bringing in a second person of much higher authority, a policeman would have, I think—again, unless, circumstantially, to get where I am, that I have to—whichever way I go, but it would appear to me that she would feel with the NTTA officer, obviously, getting someone else involved, being a reasonable deduction from the evidence—well, it's direct evidence that he did, and it would be a reasonable deduction from the evidence that she would feel that way, that this officer was here not for caretaking but for criminal investigation.

The trial court further found, based on the totality of the circumstances, that this was not a voluntary encounter but rather "a detention to investigate for possible driving while intoxicated, as the officer testified that was his reason for doing the stop." The court noted that the officer was dispatched to the scene of a possible intoxicated driver, he drove up to the location, talked to the NTTA driver, who indicated (as recalled by the trial court) that "this could be or is a DWI," at which point the officer approached appellee's SUV. The trial court concluded appellee "was not free to go at that time and that it was an illegal detention."[4] The trial court specifically concluded as follows: (1) Officer Quach's initial encounter with appellee was not consensual; (2) Officer Quach's initial encounter with appellee was not a legal community caretaking duty; and (3) Officer Quach did not have reasonable suspicion to detain appellee for a DWI investigation during his initial encounter with her. The trial court granted the motion to suppress.

## DISCUSSION

In one issue, the State contends the trial court erred by granting appellee's motion to

---

[3] The trial court is referring to the factual difference between *Priddy* and the instant case.

[4] Just before the end of the first hearing, when defense counsel referred to the portion of the video where the officer asked appellee "Ma'am are you okay," and she responded, the court states, "Yeah, that's the detention."

suppress because, under the totality of the circumstances, Officer Quach's conduct did not constitute a detention. The State argues that this was a consensual encounter. The State does not rely on the community caretaking exception.

### *Standards of Review*

We review a trial court's ruling on a motion to suppress for an abuse of discretion, and will overturn the trial court's ruling only if it is outside the zone of reasonable disagreement. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). We apply a bifurcated standard of review, giving almost complete deference to the trial court's determination of historical facts and mixed questions of law and fact that rely upon an assessment of the credibility and demeanor of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *Martinez*, 348 S.W.3d at 923. If, as in this case, the trial court makes express findings of fact, we review the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports these factual findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We must uphold the trial court's ruling if it is reasonably supported by the record and correct under any applicable theory of law. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013); *Hereford v. State*, 339 S.W.3d 111, 117–18 (Tex. Crim. App. 2011).

Determining whether a given set of facts amount to a consensual police-citizen encounter or a detention under the Fourth Amendment is an issue of law. *Johnson*, 414 S.W.3d at 192. The application of legal principles to a specific set of facts is an issue of law and is subject to de novo review. *Id.* Thus, whether Officer Quach's initial interaction with appellee constituted a consensual police-citizen encounter or an illegal detention is subject to de novo review. *See id.*

We review the facts surrounding the police-citizen interaction by considering the "totality

of the circumstances," not focusing on any one particular detail in isolation. *State v. Garcia-Cantu*, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App 2007). As with determinations of probable cause, a piecemeal or "divide and conquer" approach is prohibited. *Garcia-Cantu*, 253 S.W.3d at 244.

### *Applicable Law*

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. U.S. CONST. amend. IV. The temporary detention of a citizen by a police officer for investigation constitutes a seizure under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 16 (1968); *Priddy*, 321 S.W.3d at 86. However, not every interaction between a police officer and citizen implicates the Fourth Amendment. *Priddy*, 321 S.W.3d at 86. As the Texas Court of Criminal Appeals has explained:

> There are three distinct types of police-citizen interactions: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause.

*Wade*, 422 S.W.3d at 667; *Chambers v. State*, 397 S.W.3d 777, 781 (Tex. App.—Houston [14th] 2013, pet. ref'd); *Priddy*, 321 S.W.3d at 86. For Fourth Amendment purposes, a detention occurs "[w]hen a police officer detains someone by restricting his or her movements through either a show of force, the use of physical restraint, or by communicated commands," such that the citizen is no longer free to move independent of police direction. *Grissom v. State*, 262 S.W.3d 549, 552 (Tex. App.—Texarkana 2008, no pet.). Detentions trigger Fourth Amendment search and seizure restrictions and require reasonable suspicion to support an officer's conduct. *Garcia-Cantu*, 253 S.W.3d at 238. "Unlike an investigative detention or an arrest—each a seizure for Fourth Amendment purposes—an encounter is a consensual interaction, which the citizen may terminate at any time." *Priddy*, 321 S.W.3d at 86.

"Law enforcement officers are permitted to approach individuals without probable cause or reasonable suspicion to ask questions or even to request a search." *Priddy*, 321 S.W.3d at 87; *see also Florida v. Bostick*, 501 U.S. 429, 434–35 (1991); *Florida v. Royer*, 460 U.S. 491, 497–98 (1983). "Such an encounter does not require any justification on the officer's part." *Priddy*, 321 S.W.3d at 87. Thus, when the officer approaches someone to engage them in conversation, even if such contact is part of a formal criminal inquiry or investigation, such contact, without more, does not implicate Fourth Amendment protection. *Grissom*, 262 S.W.3d at 552. It is, instead, merely an encounter between the citizen and the police. *Id*. "Such interactions may involve inconvenience or embarrassment, but they do not involve official coercion." *Priddy*, 321 S.W.3d at 87; *see also Garcia-Cantu*, 253 S.W.3d at 243. "So long as a reasonable person would feel free to disregard the officer's questions and go about his or her business, the encounter is consensual and merits no further constitutional analysis." *Priddy*, 321 S.W.3d at 87; *see also Bostick*, 501 U.S. at 434. A Fourth Amendment seizure occurs when the implication arises that the officer's display of authority cannot be ignored, avoided, or ended. *Priddy*, 321 S.W.3d at 87; *Garcia–Cantu*, 253 S.W.3d at 243.

"Distinguishing an 'encounter' from a 'detention' is not always easy," especially considering the diversity in police-citizen interactions. *Grissom*, 262 S.W.3d at 552. Courts consider the time, place, and surrounding circumstances of a police-citizen interaction when determining whether the interaction was consensual. *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011).

> Circumstances indicating that a police-citizen interaction is a seizure, rather than a consensual encounter, include the threatening presence of several officers, the officer's display of a weapon, physical touching of the citizen by the officer, the officer's words or tone of voice indicating that compliance with the officer's requests might be compelled, flashing lights, or the blocking of a suspect's vehicle.

*Priddy*, 321 S.W.3d at 87 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

"[A]bsent this type of evidence, otherwise inoffensive conduct between a citizen and a police officer cannot, as a matter of law, amount to a seizure of that person." *Id.*; *Mendenhall*, 446 U.S. at 555.

"There is no bright-line rule to determine when an encounter becomes a seizure." *State v. Castleberry*, 332 S.W.3d 460, 466–67 (Tex. Crim. App. 2011). "Instead, courts must take into account the totality of the circumstances surrounding the interaction to determine whether a reasonable person would have felt free to ignore the police officer's request or terminate the encounter." *Id.* at 467; *Wade*, 422 S.W.3d at 667. "If ignoring the request or terminating the encounter is an option, then no Fourth Amendment seizure has occurred." *Wade*, 422 S.W.3d at 668. A court must step into the shoes of the defendant and make this determination from a common, objective perspective. *Castleberry*, 332 S.W.3d at 467. "The time, place, and surrounding circumstances must be taken into account, but the officer's conduct is the most important factor in determining whether a police-citizen interaction is a consensual encounter or a Fourth Amendment seizure." *Id.* (citing *Garcia-Cantu*, 253 S.W.3d at 244); *see also Woodard*, 341 S.W.3d at 411.

*Analysis*

In its findings of fact, the trial court found that "when Officer Quach arrived in his patrol car, he did not have his overhead lights activated," that he approached appellee's vehicle "without a weapon drawn" and "never exhibited a weapon," that Officer Quach's patrol car was parked "without any emergency lights or overhead lights activated," that upon his initial contact with appellee Officer Quach "never told [appellee] to exit her vehicle," that he "never told [appellee] to roll down her window," that "Officer Quach was the only law enforcement officer on scene" during his initial contact with appellee, and that he "never physically touched [appellee]." The trial court also expressly found, at the conclusion of the suppression hearing,

that Officer Quach "did not force [appellee] out of the car before speaking to her," "that it would not be necessary to block the [appellee's] car because the car was immovable at the time," and "that there was no overt showing of authority [by Officer Quach] other than [his wearing of] a police uniform and badge."

The State relies on these findings to argue that, based on the totality of the circumstances, there was no detention of appellee by Officer Quach "up to the point in time that Officer Quach asked Appellee if she was 'OK.'" The State also argues that upon perceiving the smell of an alcoholic beverage coming from appellee, Officer Quach possessed facts providing him with reasonable suspicion to conduct an investigatory detention to determine whether appellee was intoxicated. Appellee responds, in part, by noting that her car was on the shoulder of the road and immobilized because it had two "blown-out" tires, and "that in full darkness at 2:40 a.m., on a major freeway with traffic speeding by, a reasonable person would not simply have walked away and abandoned her vehicle, particularly not with a tow truck[5] and a NTTA employee on the scene to render assistance."

The proper inquiry in a case such as this is not whether a reasonable person would have believed she was free to leave, as appellee suggests, but, as pronounced by the Supreme Court in *Bostick*, whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter. *See Bostick*, 501 U.S. at 436; *see also State v. Valasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999).[6] As we noted earlier, law enforcement officers are free to approach individuals and ask them questions or even request a search, and such encounters do not require any justification on the officers' part. *Priddy*, 321 S.W.3d at 87. A

---

[5] It is unclear from the video whether the NTTA vehicle was actually a tow truck, but the record from the suppression hearing shows that the prosecutor repeatedly referred to it as a tow truck.

[6] The "reasonable person" test "presupposes an innocent person." *Bostick*, 501 U.S. at 438 (emphasis omitted) (citing *Royer*, 460 U.S. at 519 n.4 (Blackmun, J., dissenting)). This standard ensures the scope of Fourth Amendment protection does not vary with the state of mind of the individual being approached. *Id.* (quoting *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)).

seizure does not occur "simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434. The court of criminal appeals has also held that a seizure does not occur merely because an officer approaches a parked car in a public place and knocks on the window. *See Merideth v. State*, 603 S.W.2d 872, 873 (Tex. Crim. App. 1980); *Stewart v. State*, 603 S.W.2d 861, 861–62 (Tex. Crim. App. 1980); *see also State v. Bryant*, 161 S.W.3d 758, 760–62 (Tex. App.—Fort Worth 2005, no pet.); *Ashton v. State*, 931 S.W.2d 5, 6 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). Likewise, the fact that the individual's vehicle was already parked or stopped when the officer arrived does not answer the question of whether the interaction between the officer and the individual constituted an encounter or a detention. *See Garcia-Cantu*, 253 S.W.3d at 245 n.43; *Garza v. State*, 771 S.W.2d 549, 556 (Tex. Crim. App. 1989); *Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.).

The restriction on appellee's movement was the condition of her vehicle—the "blown-out" tires. Appellee could not drive away, and she may have been hesitant to leave her disabled car parked along the shoulder of a busy highway at 2:40 a.m., when an NTTA truck was already on the scene. Appellee's freedom of movement, however, was restricted by a factor independent of police conduct—*i.e.*, appellee's vehicle was disabled. The focus of our inquiry is not on whether a defendant's movements were confined due to circumstances independent of police action, but on the police *conduct*. *See Bostick*, 501 U.S. at 436 ("Bostick was a passenger on a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive."); *Immigration and Naturalization Serv. v. Delgado*, 466 U.S. 210, 218 (1984) (workers may not have felt free to leave when INS agents stood near the building's exits, while other agents walked through factory questioning workers, but this was not the result of

police activity because, "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers."). Although the surrounding circumstances, including time and place, are taken into account, the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure. *See Woodard*, 341 S.W.3d at 411; *Castleberry*, 332 S.W.3d at 467.

As the State points out, the factors that might indicate the police interaction with appellee was a seizure, rather than a consensual encounter, are simply not present here. The emergency or overhead lights on Officer Quach's vehicle were not activated, he approached appellee's vehicle without his weapon drawn, he never exhibited his weapon, he did not force appellee out of her car, he did not ask her to exit the vehicle before speaking to her, he never physically touched appellee before she exited the vehicle, he never told appellee to roll down her window, Officer Quach did not block appellee's vehicle, there was no overt showing of authority apart from the officer's police uniform, holstered weapon, and badge, and Officer Quach was the only officer on the scene during the initial encounter with appellee. Furthermore, the video recording of the incident shows that the officer never spoke to appellee in a commanding or authoritative tone of voice, and that he addressed appellee in a normal, conversational tone. *See Priddy*, 321 S.W.3d at 87.

Appellee also argues that the State conceded Officer Quach was not exercising a community caretaking function, and that the evidence shows he believed he was investigating a possible DWI. However, the detention test is objective, so an officer's subjective beliefs and uncommunicated state of mind do not control. *See Wade*, 422 S.W.3d at 668; *Weide v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) ("The subjective intent or motivations of law enforcement officials is not taken into account when considering the totality of the

–12–

circumstances."); *Martin*, 104 S.W.3d at 301 ("An officer's unarticulated intent to detain a person is irrelevant in determining whether the person was detained.").

Taking into account all of the circumstances surrounding the interaction, we conclude the officer's conduct in this case would not have communicated to a reasonable person that she "was not at liberty to ignore the police presence and go about [her] business." *See Bostick*, 501 U.S. at 437. Based on the totality of the circumstances, we therefore agree with the State that the initial interaction between Officer Quach and appellee, up to the point when the officer first approached the driver's side window of appellee's vehicle and asked her if she was "okay," was a voluntary encounter. The trial court erred by concluding Officer Quach's initial interaction with appellee was not consensual. When Officer Quach contacted appellee and smelled the odor of alcohol and noticed she was slurring her speech, the voluntary encounter became an investigative detention based upon reasonable suspicion appellee had been driving while intoxicated. *See, e.g., Priddy*, 321 S.W.3d at 88 (officer had reasonable suspicion defendant had been driving while intoxicated, which justified detention, after defendant rolled down the window of her vehicle, which was parked with the engine running, and officer smelled odor of an alcoholic beverage and saw defendant's bloodshot and glazed eyes); *Rubeck v. State*, 61 S.W.3d 741, 745 (Tex. App.—Fort Worth 2001, no pet.) (officer had reasonable suspicion to detain defendant where the defendant's speech was slurred and officer detected the odor of alcohol on defendant's breath); *State v. Leonard*, Nos. 05–13–00194 & 195–CR, 2013 WL 5975598, at *4 (Tex. App.—Dallas Nov. 8, 2013, no pet.) (mem. op., not designated for publication) (initial encounter between officer and appellee was consensual, but after officer smelled marijuana coming from appellee's car, he obtained requisite probable cause to search the vehicle).[7] The trial court erred

---

[7] Appellee cites *Ford v. State*, 158 S.W.3d 488 (Tex. Crim. App. 2005), where the Court of Criminal Appeals held that the investigative detention was unlawful because the State failed to produce specific, articulable facts to justify the detention. *Id*. at 493. The only evidence presented in *Ford* was the officer's testimony that Ford was following too close, and the Court determined this testimony was too conclusory to

by concluding Officer Quach did not have reasonable suspicion to detain appellee for a DWI investigation during the initial encounter.  Accordingly, we sustain the State's issue.

We reverse the trial court's judgment and remand this case for further proceedings.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
131607F.U05

---

establish reasonable suspicion. *Id.*  *Ford*, however, is inapplicable given the evidence that the initial interaction between Officer Quach and appellee was a voluntary encounter, and that during the consensual encounter the officer smelled alcohol and noticed appellee was slurring her speech, thus providing reasonable suspicion to begin an investigative detention.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-13-01607-CR          V.

AMY LYONS, Appellee

On Appeal from the County Criminal Court No. 3, Dallas County, Texas
Trial Court Cause No. MA13-34796.
Opinion delivered by Justice Myers.
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for further proceedings.

Judgment entered this 31st day of July, 2014.