

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

No. 04-15-00291-CR

The **STATE** of Texas,
Appellant

v.

Richard Michael **DONOHOO**,
Appellee

From the County Court at Law No. 8, Bexar County, Texas
Trial Court No. 453259
The Honorable Celeste Brown, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:       Rebeca C. Martinez, Justice
               Patricia O. Alvarez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  June 22, 2016

I dissent because I believe under the applicable standard of review the record supports the trial court's findings and conclusions that the initial interaction between the officers and Donohoo was not a consensual encounter, but a detention from the time the officers induced Donohoo into coming out of his apartment.  Because I also believe the officers lacked reasonable suspicion that Donohoo had committed the offense of DWI at the time the detention occurred,[1] I would affirm

---

[1] Because the majority concludes that Donohoo was not detained when he left his apartment, it does not reach the legal issue of whether the officers had reasonable suspicion of DWI at that time to support a detention.

the trial court's suppression order in its entirety and suppress all the evidence obtained as a result of the illegal detention.

A "detention" triggers the Fourth Amendment's search and seizure restrictions and requires an articulable suspicion to support even a temporary seizure, while a citizen-police "encounter" does not implicate any Fourth Amendment requirements or restrictions. *State v. Garcia-Cantu*, 253 S.W.3d 236, 238 (Tex. Crim. App. 2008). Whether a citizen-police interaction in a particular case amounts to a detention, or merely a consensual encounter, involves the application of legal principles to a specific set of facts and is therefore reviewed de novo as a question of law. *Id.* at 241. We evaluate whether, "taking into account all of the circumstances surrounding the encounter, the police conduct would have 'communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 242 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). The question is whether the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *Id.* ("It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure.").

Under the applicable standard of review, when the trial court makes express findings of fact in support of its ruling, the appellate court does not engage in its own factual review, but determines only whether the evidence, viewed in the light most favorable to the court's ruling, supports the fact findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). Unless the trial court abused its discretion by making a finding not supported by the record, we give "almost total deference" to the court's findings of historical fact on appeal. *Id.* We give similar deference to the trial court's determination of mixed questions of law and fact that rely on evaluations of credibility and demeanor, but otherwise review the court's ruling de novo. *Id.* The

majority opinion fails to afford sufficient deference to the trial court's findings of fact in support of its legal conclusions that Donohoo was detained when he exited his apartment. This factual deference is appropriate, and required, ***before*** we conduct the de novo application of the legal principles to the specific set of historical facts to determine whether the interaction was a consensual encounter or a detention. *See Garcia-Cantu*, 253 S.W.3d at 241; *Melendez v. State*, 467 S.W.3d 586, 592 (Tex. App.—San Antonio 2015, no pet.) ("Which type of encounter exists ***under a given set of historical facts*** is a question of law that is reviewed de novo.") (emphasis added).

In support of its conclusion that Donohoo was detained "when he was asked to leave his home," the trial court relied on the following fact findings: (i) Officer Madiano, accompanied by another officer, "repeatedly" knocked on Donohoo's door and/or window; (ii) Officer Madiano, who is turning his microphone on and off, is heard on the video "telling a male that his car is about to be towed" for lack of a handicap placard; (iii) Donohoo "is asked to come outside" and "requests to put pants on;" (iv) Officer Madiano makes contact with Donohoo after he is "coerced outside under the guise of the vehicle not having a handicapped placard," and Donohoo "admits to driving a couple of hours prior" but states any damage to the vehicle is two-weeks old and he is unaware of any new damage; (v) the officers ask Donohoo questions "regarding the route he took home and whether he had been drinking;" and (vi) "less than 3 minutes after he was told to go outside because his car was being towed," Donohoo requests to go back inside his apartment but the officer declines his request, telling him, "No, I want you to stay out here 'for a sec,' and look at the damages a while," at which point the officer radios for a DWI officer to take over the investigation. The trial court also found the officers' investigation was centered on Donohoo throughout their interactions with him "based solely upon the vehicle's license plate and description given by the unnamed

witness." Finally, the trial court found that "Officer Madiano's testimony confirmed that Donohoo was detained when he left his home."

In holding that Donohoo was not detained when he left his home, the majority states that the trial court's findings that the officers "asked [Donohoo] to come outside" and "coerced" him to leave his apartment are not supported by the record, and that the remaining facts found by the trial court do not amount to a "display of official authority implying that Donohoo could not have ignored the officer's statement that his car was about to be towed and terminated his encounter with the officers." The majority therefore concludes Donohoo's interaction with the officers at that point (when he left his home) was a consensual encounter, not an investigative detention. I strongly disagree.

The majority discounts the trial court's finding that the officers "coerced" Donohoo to come outside his home "under the guise of the vehicle not having a handicapped placard" by stating that "coercion" is a question of law to which no deference is afforded, thus allowing it to disregard historical facts. The authority relied on for that statement is *Garcia-Cantu*'s principle that whether an interaction with officers is a consensual encounter or a detention is a question of law. *See Garcia-Cantu*, 253 S.W.3d at 241. However, a determination of whether the police conduct was coercive is a mixed question of law and fact that depends upon both the trial court's findings of historical fact concerning the conduct engaged in by the officers, which are credibility-based and thus afforded deference, and the application of the legal principles used to determine whether the officers' conduct was coercive, which is reviewed de novo. *See Garcia-Cantu*, 253 S.W.3d at 244-49. I believe when reviewed under the appropriate standard, the record does support the trial court's finding that Donohoo was coerced outside by the officers.

I further disagree with the majority's characterization of the video recording of the officers' interaction with Donohoo as contradicting the trial court's findings that he was "asked to come outside" and was "coerced" into leaving his apartment "under the guise of the vehicle not having a handicapped placard" and "about to be towed." Based on its review of the video tape, the majority concludes that the officers did not command Donohoo to leave his home. The majority's view is too literal. The video recording[2] shows that while the officers did not give a direct request or command for Donohoo to "come outside," the uniformed officers used the repeated threat of an imminent arrival of a tow truck coming to tow his vehicle, and told Donohoo that he could not be heard through the window, to entice Donohoo to come outside where they could conduct an investigation into whether he committed DWI, i.e., observe his demeanor, smell his breath, and administer the HGN and field sobriety tests.[3]

In detail, the video recording shows the following sequence of events. Once they finally locate the correct apartment, the officers are heard knocking loudly on Donohoo's door and/or window two times. While knocking, one officer yells through the window/door that his "car's about to get towed." Donohoo then says something that cannot be heard, and the officer then repeats, "Your car's about to get towed, man." Donohoo again replies with something that cannot be deciphered (but sounds like "what do you want?") and the officer again tells him, "the tow truck's coming to get your car . . . the Lincoln . . . it's in a handicap spot and it doesn't have a handicap placard . . . ." The officer is also heard telling Donohoo that he cannot hear what he is

---

[2] The video camera was stationary in the patrol car parked in the parking lot and does not show the interaction between the officers and Donohoo at his apartment. However, the interaction can be heard on the audio from the officer's body microphone.

[3] The majority opinion ignores paragraph 5 of the trial court's findings of fact, and the evidence on the videotape, that after driving around the apartment parking lot looking for the vehicle, Officer Madiano and his partner spent approximately 30 minutes walking around, going to different apartments and speaking to female inhabitants, while turning the audio on and off, before finally locating Donohoo's apartment and knocking on his door and/or window while yelling that his "car's about to get towed."

saying through the window. Donohoo is then heard opening the door and the officer greets him and asks his name. Because there is no video image it is impossible to tell whether Donohoo only opened the door and stood there, or opened it and stepped outside, leaving the door either open or closed. The officer then begins questioning Donohoo about drinking and driving. Specifically, the officer asks him if he "was driving a little while ago?" Donohoo replies, "a little while ago." The officer then asks him "how long ago?" Donohoo states, "about two hours ago." The officer then tells him, "something's wrong with your car." Donohoo says, "What?" The officer then asks him if he has been drinking, to which Donohoo replies, "No." The officer then tells Donohoo that he "is breathing in my face" and smells like alcohol, and Donohoo admits he has been drinking. The officer again states that "something's wrong with your car . . . it got wrecked or something. It's all messed up." When the officer asks, "do you know what happened?" Donohoo states that he does and explains that two weeks ago his car's right side was damaged at an event. When the officer tells him there is fresh damage on the left side of the car, Donohoo expresses surprise and disbelief. Donohoo states that he has been at home. Donohoo then says, "let me put some pants on" and the officer states, "Ok" and "I'll show you [the damage]." The video image picks up with the officer and Donohoo arriving in the parking lot as the officer shows Donohoo the fresh damage to the side of his car. Donohoo confirms at that point that the Lincoln car is his vehicle. Donohoo then admits he drove the vehicle home from a bar and explains the route he drove, but states he does not remember hitting a light pole; he also admits that "perhaps" he had too much to drink and again confirms that he was driving. The officer then asks Donohoo if he has his identification with him. Donohoo replies, "Ummm, let me go back in." The officer tells him, "No, I want you to stay out here for a sec and look at your damage for a while . . . ." The officer is then shown walking away and calling in a DWI on his radio. The other officer remains with Donohoo next to his

vehicle while Donohoo looks for something and then hands it to the officer. The second and third videos show the rest of the interaction between the officers and Donohoo, including the administration of HGN and field sobriety tests and his ultimate arrest for DWI.

As noted in *Garcia-Cantu*, the totality of the circumstances test is "designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Garcia-Cantu*, 253 S.W.3d at 244. The surrounding circumstances, including time and place, are considered, but the officer's conduct is the most important factor in determining whether an interaction was consensual or a Fourth Amendment seizure. *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011) (noting that if it was an option to ignore the officer's request or terminate the interaction, then a seizure did not occur). As the court stated in *Garcia-Cantu*, in evaluating the officer's seemingly neutral question asking the defendant "What are you doing here?" within the totality of the surrounding circumstances, the court considers whether the officer's words were "more in the nature of an official command rather than a friendly or neutral inquiry" and "much depends upon the tone and level of voice, as well as the questioner's demeanor." *Garcia-Cantu*, 253 S.W.3d at 248; *see Crain v. State*, 315 S.W.3d 43, 49-50 (Tex. Crim. App. 2010) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), for its example of "circumstances that might indicate a seizure … the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the *use of language or tone of voice* indicating that compliance with the officer's request might be compelled."). Here, the trial court viewed the videotape and observed Officer Madiano's demeanor when he testified and determined that the officer's repeated statement to Donohoo that his car was "about to be towed" by a tow truck en route for a specified parking violation was more in the nature of an official request or command to come outside and talk to the officers than a

friendly warning. *See Garcia-Cantu*, 253 S.W.3d at 248. We must defer to the trial court's evaluation of credibility and demeanor; we do not conduct our own credibility assessment. *See Johnson*, 414 S.W.3d at 192. Here, the video and rest of the record supports the trial court's evaluation that under the totality of the circumstances the uniformed officers' conduct, which included waking Donohoo during the night by repeatedly banging on his door/window and simultaneously yelling that a tow truck was coming to tow his Lincoln for being parked in a handicap spot before Donohoo opened his door, amounted to coercion to lure him outside so they could conduct a DWI investigation.

Finally, the courts have been very clear that there is no per se rule or set of exclusive factors to determine detention; rather, the totality of the circumstances analysis is fact-specific and conducted on a case-by-case basis. *Garcia-Cantu*, 253 S.W.3d at 243; *Crain*, 315 S.W.3d at 50-51. Applying the appropriate standard of review, I believe the record supports the trial court's findings of fact, its determination of mixed questions of law and fact, and its application of the law to that set of facts in concluding that Donohoo was detained at the time he came out of his apartment in response to the officer's statements that a tow truck was coming to tow his Lincoln for a parking violation and that he could not hear his continuing conversation with Donohoo through the window. Donohoo was not approached by police in a public place and asked questions; rather, he was awakened in his home by repeated knocking on the door/window by uniformed police yelling that his vehicle was about to be towed for a specified parking violation, which created the atmosphere of an urgent or insistent request to "come outside right now." *Cf. Crain*, 315 S.W.3d at 49 ("An encounter takes place when an officer approaches a citizen in a public place to ask questions, and the citizen if willing to listen and voluntarily answers."). After an initial discussion through the window, the officer tells Donohoo he can no longer hear him, thus

requiring Donohoo to then open his door. While, arguably, Donohoo could ignore repeated door-knocking alone, it is difficult to imagine that he could ignore a police officer advising him that an immediate sanction, i.e. towing, presumably done at the officer's direction, was about to result from a specified offense, i.e., a parking violation. It is even harder to determine that such official conduct was not a display of authority.

The officers never told Donohoo he did not need to comply or answer their questions, and the officers made it clear by their subsequent questions to Donohoo about drinking, driving, and damage to his car that they suspected him of criminal activity, i.e., DWI. The audio on the video recording shows that it was only *after* he opened the door to the officers that Donohoo made the admissions cited by the majority, to wit: that he had been driving two hours earlier, that he had been drinking, and that the Lincoln was his vehicle and he knew about the prior right-side damage, and that such admissions were made in response to the officers' questions.[4] Moreover, the officer denied Donohoo's request to go back inside his apartment which was voiced shortly after he accompanied the officers into the parking lot. The majority notes that Donohoo was later allowed to go back inside to get a jacket, but omits that the officers accompanied him back inside his home purportedly upon Donohoo's invitation; he was not alone in his home and he was not free to stay inside and not come back out with the officers. In addition, while there were two officers who made the initial contact with Donohoo, there were ultimately four officers who participated in the DWI detention of Donohoo. Under the totality of these circumstances, I would conclude that a reasonable person would not have felt free to ignore the officers' repeated knocking and insistent

---

[4] The majority incorrectly states that, "*Before* Donohoo said he would come outside, Donohoo told the officers he had been drinking, he owned the Lincoln car that was parked in a handicap spot without a handicap placard and had driven that evening, and his car had sustained damage to its right side two weeks prior to that evening." (emphasis added).

statements that his vehicle was "about to be towed" or to disregard the officer's questions and terminate the encounter.

Therefore, as explained, I would hold that the interaction was not a consensual encounter but an illegal detention that warrants suppression of all evidence flowing from the detention, and that the officers lacked reasonable suspicion that Donohoo had committed the offense of DWI at the time the detention occurred. I would affirm the trial court's suppression order in its entirety and suppress all the evidence obtained as a result of the illegal detention.

Rebeca C. Martinez, Justice

DO NOT PUBLISH