

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00236-CR

———————————————————

DORIAN RAY WOODARD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1671445D

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

### I. Introduction

The State charged Appellant Dorian Ray Woodard with capital murder based on the 3:30 a.m. shooting of a convenience store clerk on January 17, 2021.[1] The shooting was captured on the store's surveillance video.[2] The shooter wore a face mask, gloves, and a red overcoat. Then-eighteen-year-old Woodard confessed to the police a few days later during a custodial interrogation.

Woodard sought to suppress his confession, but the trial court denied his motion to suppress "unless something changes in evidence before the Court." Woodard pleaded not guilty, and after a week-long trial, a jury found him guilty of murder (a lesser-included offense) and assessed his punishment at life in prison and a $10,000 fine. *See* Tex. Penal Code Ann. §§ 12.32, 19.02. In a single issue, Woodard complains that the trial court erred by denying his motion to suppress. Because the trial court did not abuse its discretion by denying Woodard's motion, we affirm.

### II. Discussion

In his single issue, Woodard complains that his confession was involuntary under the Due Process Clause. The State responds that Woodard failed to show that

---

[1]A customer reported the offense to 911 at 4:55 a.m. Eight .22-caliber shell casings were found at the scene, and four of the eight bullets hit the clerk.

[2]The store had a sixteen-camera surveillance system. A Domino's Pizza in the same strip mall also provided external surveillance video.

his custodial statement was involuntary due to police coercion or overreaching that overbore his will and because the record shows that his statement was voluntarily made.

## A. Standard of review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281.

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than on evidence introduced later. *See Gutierrez v. State*,

221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). But this general rule does not apply when the parties consensually relitigate the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 809; *see Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012) ("If the parties consensually broach the suppression issue again before the fact-finder at trial, the reviewing court should also consider the evidence adduced before the fact-finder at trial in gauging the propriety of the trial court's ruling on the motion to suppress.").[3]

## B. Suppression

The trial court heard the motion to suppress after voir dire but before trial began. During trial, defense counsel reurged the suppression motion. We abated the appeal for the trial court to make findings of fact and conclusions of law regarding the voluntariness of Woodard's confession. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6; *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013). We reinstated the

---

[3]The State argues that there was no consensual agreement to reopen the suppression issue. However, this disregards the trial court's initially denying the suppression motion "unless something changes in evidence before the Court." Further, when the prosecutor offered the interview into evidence outside the jury's presence, the trial court noted to defense counsel, "[O]bviously, y'all are not waiving any of your objections . . . outside the presence of the jury, so I will take those into consideration again and overrule those." Before the jury, Woodard again reurged "the objections that [he] made in the previous hearing with regard to" the interview, and the trial court overruled them again. We will accordingly consider the relevant evidence adduced at trial.

appeal upon receipt of the supplemental clerk's record containing the trial court's findings and conclusions.

## 1. Findings of fact and conclusions of law

The trial court made forty-five fact findings; the following, as summarized, are particularly relevant:

- During the interview, Woodard's hands were cuffed, but his legs were not shackled.

- Neither Detective Rodriguez nor Detective Coleman were armed during the interview, and they did not threaten or coerce Woodard.

- Neither Detective Rodriguez nor Detective Coleman made any promises or bribes in exchange for Woodard's statement.

- The detectives did not deny Woodard breaks for water or to use the bathroom.

- Detective Rodriguez did not believe Woodard was under the influence of drugs or alcohol during the interview.

- Detective Rodriguez testified that she did not believe at any point during the interview that any of Woodard's statements were involuntarily made.

- Woodard was 18 years old at the time of the interview.

- Detective Rodriguez testified that Woodard's age and inexperience with law enforcement did not factor into how she interviewed him.

- Detective Rodriguez candidly admitted that one tactic she used during the interview was to play on Woodard's emotions.

- During the interview, the detectives discussed Woodard's mother, asked him if he was remorseful, and asked "did a monster do this or somebody who cared?"

- Detective Rodriguez was unaware of whether Woodard had graduated high school, and she did not know his IQ.

- Detective Rodriguez did not attempt to determine if Woodard had any mental health problems prior to the interview.

- At the time of the interview, Detective Rodriguez was unaware that Woodard had prescription medication in his possession when he was arrested.

- Despite questioning Detective Rodriguez about the possible impact of Woodard's education, IQ, and mental health, Woodard did not put on any evidence demonstrating a poor or incomplete education, a low IQ, or a history of mental health problems.

- The trial court found Detective Rodriguez's testimony credible and supported by the record.

Based on its findings, the trial court made fifty-one conclusions of law, determining that the weight of the credible evidence supported the following conclusions and, ultimately, that Woodard had voluntarily, knowingly, and intelligently waived his rights:

- Woodard was not intoxicated or otherwise incapacitated during the interview.

- Woodard was of average intelligence, thus weighing against a finding that his waiver was not intelligently or knowingly made.

- Woodard's conduct during the interview demonstrated that he had the requisite level of comprehension to waive his *Miranda* rights.

- The detectives did not resort to intimidation, coercion, or physical pressure to obtain Woodard's statement and, throughout the interview, Woodard and the detectives were civil, and the tone of the interview was conversational.

- Woodard's age did not render him unable to intelligently and voluntarily waive his *Miranda* rights.

- Woodard's waiver of his *Miranda* rights was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

- Woodard understood the nature of his rights and the consequences of abandoning those rights when he waived them.

The trial court also concluded that the amount of time that Woodard was in the interview room (approximately two hours) was insufficient to give rise to an inference that his confession was involuntary, and the interview itself was approximately one hour, a relatively short period of time for an interview regarding a capital murder. The trial court noted that the detectives advised Woodard that he could terminate the interview at any time and that they never told Woodard that he would not be able to contact his family until he confessed: "both of these facts demonstrate that his confession was voluntary." Further, neither detective engaged in deceptive interview techniques or trickery to obtain the confession, and the weight of the credible evidence showed that they did not engage in any behavior that could be classified as overreaching or coercive. The trial court concluded that Woodard's statement was not involuntary due to police overreaching or coercion.

**2. Suppression hearing**

At the suppression hearing, Woodard's counsel asked the trial court to take judicial notice of testimony from a hearing "in March," and the trial court agreed, stating, "I'll take judicial notice that we – of the record there, and I'll see what you mean when we get there." We supplemented the record with the transcript from the March 31, 2022 hearing at which Dr. Jeanine Galusha, a psychologist with specializations in neuropsychology and forensic psychology, and Dr. Rahn Minagawa,

a clinical and forensic psychologist, testified but did not address the specifics of Woodard's case.[4]

A single witness—Arlington Police Detective Jennifer Rodriguez—testified during the suppression hearing. Detective Rodriguez stated that on January 21, 2021, as part of her murder investigation, she interviewed Woodard at the police station after he was arrested on a warrant. Detective Coleman was with her, and the interview's purpose was to obtain a confession. The State offered an unredacted copy of State's Exhibit 155, the recording of Woodard's interview, and noted that a redacted version would be offered at trial. State's Exhibit 155 is an hour-and-half long recording, but the first 26 minutes show an empty interview room.

Woodard was in handcuffs during the interview. Detective Rodriguez offered Woodard water, asked if he was comfortable, asked him how old he was, and asked him where he went to school. Woodard told her that he was eighteen and said the name of a school.

---

[4]The March hearing's purpose was to challenge Penal Code Section 12.31(a)(2)'s constitutionality. *See* Tex. Penal Code Ann. § 12.31(a)(2) (providing that an individual adjudged guilty of a capital felony in a case where the State does not seek the death penalty shall be punished by imprisonment for life without parole if the individual committed the offense at age 18 or older). At the hearing, Dr. Galusha testified that "major morphological and functional changes" to the brain occur during adolescence and stated that there was not much difference between the brain of a 15-year-old and the brain of an 18-year-old, particularly regarding impulse control, the ability to emotionally regulate, and the ability to think about the potential consequences of behavior. Dr. Minagawa testified that factors other than brain development could also shape adolescent behavior, including a history of trauma.

8

Detective Coleman explained to Woodard that they were working on a case, that they were comparing information against evidence they had already collected, and that they were asking for him to be honest. Woodard told them that he had been arrested before but never interrogated.[5] At that point, Detective Rodriguez read to Woodard his *Miranda* rights as he read along from a copy provided to him, and Woodard nodded that he understood each of the rights as they were read to him. When the detectives then asked if he wanted to talk with them about why he was there, Woodard replied, "I would like to know why."

The detectives each encouraged Woodard to be honest, telling him that they already knew the answers to some of the questions they were going to ask. Woodard assured them that he had never "hit a lick"[6] within walking distance of where he lived.[7] He told them that he had seen information about the offense on the news and that some members of his family had asked him if he was the perpetrator. Detective Rodriguez asked Woodard, "Why do you think that [your family] would be asking you if it was you?" Woodard said that it was because of his hairstyle, which he had changed the same day as the offense and because he had come home nervous after

---

[5]This statement was redacted from the recording that was published to the jury during the trial's guilt–innocence phase.

[6]During the trial's punishment phase, Detective Coleman explained that "hitting a lick" generally meant committing a theft or a robbery.

[7]Detective Rodriguez testified before the jury that Woodard lived in an apartment that was within a ten-minute walk to the convenience store.

stealing from vehicles twenty minutes away from home. He said that his father found his account hard to believe.

Detective Coleman cautioned Woodard more than once to be honest because what Woodard had seen on television was not all the information the police had. Woodard admitted he had been at the convenience store the same night of the offense and did not buy anything. He said he thought he had been the only person in the store at that time besides the store employee. Detective Coleman again cautioned Woodard to be honest, telling him, with regard to the surveillance video, "I've seen it. And I'm looking at you now, and I know what I know."

Detective Rodriguez chimed in by pointing out to Woodard that his mother and his father had identified him from the media clip showing the perpetrator. She told him that she thought he wanted to unburden himself and that she wanted to know if he felt bad. She added that only he could tell them if it was an accident but that there was no question that he had done it. Woodard replied, "I was hitting my licks, that's all I know. I rob but I don't kill."[8] When Woodard added that his family thought it was him because of the offense's timing, Detective Rodriguez replied, "They don't believe [your denials] because it was you." When Woodard admitted that

---

[8]This portion of Woodard's statement was redacted during the guilt–innocence phase but admitted into evidence during the punishment phase.

he had deleted his social media account that day, Detective Coleman told him that deleting did not destroy social media records.[9]

Detective Rodriguez encouraged Woodard to show remorse because "[he] couldn't have done that and not felt bad about it." She reached across the table to him, told him that she knew what had happened was scary, and again encouraged him to unburden himself. Woodard stated that the convenience store clerk had been disrespectful in tone and that he shot him a few times. He did not remember how many times. Detective Rodriguez asked him where the gun was and how he got it. He had obtained the gun "hitting a lick" around a week before he shot the clerk. He had not intended to rob the store when he shot the clerk out of anger. Woodard admitted that he had shot other people before but had never previously killed anyone. He said that he had shot fourteen people, including the clerk,[10] and that those shootings had been anger and gang-related. When asked if he had ever been diagnosed with a mental-health issue, Woodard said that he had not been but that his mother "said [he] was probably schizophrenic" because she was schizophrenic.

When Woodard muttered something about getting the death penalty, Detective Rodriguez told him that it was not for them to determine. Woodard, who was taking a

---

[9]No social media records were offered at trial.

[10]This statement was also redacted during the guilt–innocence phase but shown during the trial's punishment phase.

11

Lyft when he was arrested, told the detectives that he had been heading for Lufkin to avoid bringing drama to his family.

As the interview neared its conclusion, Detective Rodriguez summarized Woodard's testimony that he had argued with his mother and then walked to the convenience store from their apartment with the intent to buy some snacks and perceived the clerk as disrespectful. Woodard said that he had been angry, walked behind the counter, and then "did what [he] did." Woodard noted that the clerk might not have been disrespectful and that Woodard had just taken it that way. He disposed of his clothes and the gun in the apartment dumpster.[11]

Detective Rodriguez testified that at no point during the interview did Woodard ask to terminate the interview or to have an attorney present and, as shown in the recording, neither she nor Detective Coleman threatened or coerced him into giving a statement or promised or bribed him with anything in exchange for making a statement.

During cross-examination, when asked whether Woodard's age and inexperience with law enforcement had played into how she interviewed him, Detective Rodriguez replied, "No." She did not know that he had not graduated from high school and stated that she would have been surprised to learn that his IQ was considered in a low-average range. She agreed that "I would like to know" is not a

---

[11]During trial, Detective Rodriguez stated that the police never found the clothes that Woodard had worn that night or the gun that he used.

12

definitive, "Yes, I will answer your questions." She also agreed that it was fair to say that one of her interview tactics had been to play on Woodard's emotions.

Regarding either-or choices that she had given Woodard to respond to during the interview, the following colloquy occurred:

> Q. And so his options were -- and whether it was you or Detective Coleman -- you assumed guilt, and you say, "You're either remorseful or you're a bad person," or, "you're a monster," something along those lines.
>
> You remember those two approaches he could take to answering your questions?
>
> A. Yes.
>
> Q. And so with that question, if he refuses to confess, he's a monster or he's a bad person; if he confesses, he's remorseful. Correct?
>
> A. That was not my intention to say that he was a monster. I'm saying this is what it looks like on [the surveillance] video.
>
> Q. Sure. But those are his two options. If he confesses and tells you he did this, that's remorseful. If he says, "No, I had nothing to do with this," all you have is the [surveillance] video and he's a bad person. I mean, those are his two choices, in reality, correct?
>
> A. I did not feel that was his two choices.
>
> Q. You could understand how a person -- a young person who has never been interviewed by detectives before and there are two trained homicide detectives in a small room -- how a person could potentially feel isolated and see those as their only two options, correct?
>
> A. Yes.

Detective Rodriguez did not look up the prescription medicines that were found on Woodard when he was arrested but said that she would not be surprised

that they were for treating major depressive disorder, bipolar disorder, or anxiety disorder but that she would have been surprised that one was for schizophrenia.

At the conclusion of Detective Rodriguez's testimony, Woodard's counsel argued that Woodard's statement had been involuntary because the tactics the detective had used were designed to elicit incriminating responses and were coercive, particularly given Woodard's youth and inexperience. Counsel then argued,

> With regard to Mr. Woodard's mental capacity, the Court, having heard Dr. Galusha testify in our previous hearing[12] -- the Court would recall if the record was reviewed -- that he did, in fact, have low intelligence. Low average intelligence is what I believe the range is.[13] Those factors are also relevant when it comes to an individual's voluntariness in giving a statement.

---

[12]The court reporter has informed us that other than the March hearing there were no other pretrial hearings at which Dr. Galusha testified. In a hearing outside the jury's presence during the trial's guilt–innocence phase, Dr. Galusha testified about her evaluation of Woodard and her determination that he suffered from a fairly significant, largely untreated mood disorder. The trial court did not expressly consider this testimony as to suppression, although the trial court did ask whether Woodard wanted to proffer her testimony "for any other reasons" that had not already been heard.

[13]"IQ" or "intelligence quotient" testing is "a significant factor in making both the legal and clinical assessment of intelligence or intellectual functioning." Robert M. Sanger, *IQ, Intelligence Tests, "Ethnic Adjustments" and Atkins*, 65 Am. U.L. Rev. 87, 101 (2015) (discussing IQ in the death-penalty context). During the trial's punishment phase, Dr. Galusha testified that she had determined that Woodard's IQ fell "in the low average to the bottom part of the average range overall," with a full scale of 88, and that the average range is 90 to 110. Woodard was able to pronounce words at an 11th grade level and to understand written information at the 10th grade level, but he understood math at a 4th grade level. Dr. Galusha noted that Woodard had reported to her multiple suicide attempts and that he had scars on his arms from cutting.

14

Coupled with his youth, coupled with his intellectual disability, his limited intellect and, obviously, his limited education are all significant factors that the Supreme Court has reviewed with regard to whether or not a statement is voluntarily given.

The prosecutor responded that there was no showing that Woodard was incapacitated to the level that he was unable to give a knowing or voluntary statement.

The trial court denied the motion to suppress, stating, "So far, I found, with regards to the [motion to suppress], that the State proved by a preponderance in our hearing outside the presence of the jury that the defendant did voluntarily, knowingly, and intelligently waive his *Miranda* rights and speak to officers voluntarily, so I'm denying [the motion] currently, unless something changes in evidence before the Court."

### 3. Trial evidence

Twenty-year-old Sedarius Phillips, who had been Woodard's best friend, learned about the shooting on social media and thought Woodard was the perpetrator. Phillips's uncle Jaylen Terry contacted the police, and they spoke to the police together about Woodard. During cross-examination, Phillips stated that Woodard's friends "always knew part of [Woodard's] anger issue." Phillips testified, "[Woodard] was a little schizophrenic, I guess . . . or had violence, but we never judged him off that because he didn't give us that demeanor." Phillips said that he had seen cuts on Woodard but did not know Woodard had made them himself, and he

15

denied having told Detective Rodriguez that he had seen self-inflicted cut marks on Woodard's arm.

Detective Rodriguez testified before the jury during the publication of the store's surveillance video, which showed the shooter enter the store at 3:17 a.m., depart at 3:33 a.m., and then re-enter the store and leave a minute later. At 3:30 a.m., the shooter opened fire on the clerk, exited, then returned to take tobacco products and to attempt to access the cash register. From the surveillance video, the police developed a suspect profile.

After Detective Rodriguez spoke with Terry and Phillips, she developed Woodard as a person of interest, acquired a photo of him, and located his residence, which was a ten-minute walk to the east of the store. She relayed that information to SWAT for surveillance to ensure that Woodard did not flee before the arrest warrant issued. Four days after the shooting, the surveillance unit saw Woodard leave the apartment with multiple bags and get into a red Kia. The Kia, driven by a Lyft driver and on its way to take Woodard to a bus station in Dallas, was stopped for a traffic violation at 6:50 a.m.

Detective Rodriguez had been drafting Woodard's arrest warrant that morning, and at the time of the traffic stop, the warrant had not yet been issued by a judge. The arrest warrant issued at 8:10 a.m., Detective Rodriguez received it at 8:18 a.m., and Woodard arrived at 8:53 a.m. at the police station, where she and Detective Coleman interviewed him after giving him the *Miranda* warnings. When the prosecutor offered

the redacted copy of the interview, the trial court reconsidered the earlier suppression objections, overruled them, and allowed the recording to be published to the jury.

Detective Rodriguez stated that when they first met with Woodard, they had not yet brought up the convenience-store incident when Woodard said, "I saw it on the news." She testified that Woodard had initially denied going to the store but ultimately admitted that he went there after a fight with his mother, that he brought up that his parents had asked him if he was the shooter, and that Woodard said he had admitted to his mother that it was him. He had told Phillips about it and assumed that was how Terry found out. Detective Rodriguez did not show Woodard the surveillance video, but he told her things that he would have known only if he had either seen the video or had been there. Woodard told the police that he had thrown the gun behind the nearby Domino's Pizza but then returned to retrieve it, and the Domino's Pizza surveillance video, which showed this, was admitted into evidence and published to the jury; Detective Rodriguez stated that Woodard had not seen the Domino's Pizza surveillance video. Woodard had changed his hair since the night of the offense, and he had shut down his social media on the day of the offense.

The Lyft driver gave the police written consent to search so they could retrieve Woodard's bags from the vehicle, and Detective Rodriguez obtained a search warrant for the bags. Over Woodard's objection, the trial court admitted photos of the bags' contents into evidence and allowed the State to publish them. Among other things, the bags contained several packages of cigarillos and loose cigarillos. Detective

17

Rodriguez testified that the loose cigarillos were "very similar to what was laying around [the clerk's] head," stored behind the store's counter, and stolen by the shooter.

During cross-examination, Detective Rodriguez agreed that Woodard's bags contained prescription medication that included mood stabilizers to treat depression and bipolar disorder, medication to treat anxiety and major depressive disorder, and an antipsychotic drug used to treat schizophrenia and bipolar disorder, but she also stated that they were not in a prescription bottle prescribed for Woodard.[14] When asked if she had taken into consideration while interviewing Woodard whether he had any diagnosed mental illness, Detective Rodriguez testified that she had asked him and that he told her no. She stated that she had not taken into consideration his education level or his age in conducting the interview. She agreed that at the time of the interview, she had already made up her mind as to guilt and wanted to know "why" and to obtain a confession.

Defense counsel then posed the following questions to Detective Rodriguez about the custodial interview:

---

[14]During the trial's punishment phase, Woodard's mother testified that she took medication for bipolar schizophrenia and noted that she recognized Woodard's behavior—self-harm, anger, depression, and cutting—as similar to her condition. She had never taken Woodard to a doctor for an official diagnosis and treatment but had allowed him to use her prescription medication Seroquel (a medication to treat schizophrenia) to medicate himself.

Q. And so -- and, again, more so, . . . Detective Coleman -- but you posed these two hypothetical situations: Are you remorseful or are you a monster? Right? You remember Detective Coleman actually using that word "monster"?

A. Yes.

Q. If he doesn't confess, he's a monster, right? If he does confess, he's remorseful. You leave him with no option. You leave him with an option of taking the lesser of two evils. I'm going to be remorseful and I'm going to confess to this crime; otherwise, he's seen as a monster.

Do you not feel that's . . . inappropriate to be doing with an 18-year-old kid?

A. No.

Q. You do not?

A. I do not.

Q. Where did you learn these tactics? You said you learned techniques and tactics to interview people. What technique was it?

A. I can't point to a specific technique for that. I've been to multiple different training classes and then just my experience of talking to people.

Q. Is it the Reid technique? Have you heard of that?

A. I have heard of the Reid technique.

Q. Is that what you were taught on?

A. That was one of the training courses that I went to.

Q. You know there's problems with that technique, right?

A. I was unaware of that.

No evidence was offered to explain the Reid technique. Detective Rodriguez

agreed that Woodard had shown tears during the interview but said that she was not

sure whether he was remorseful because of what he had done or because he got caught.

## C. Voluntariness

A defendant may argue that his statement was involuntary based on the Due Process Clause only when there is police overreaching, i.e., some coercive police activity. *Oursbourn v. State*, 259 S.W.3d 159, 169–70 (Tex. Crim. App. 2008).[15] Factors to consider in addressing whether a suspect's will has been overborne and his capacity for self-determination critically impaired by law-enforcement overreaching include the accused's youth, his lack of education, his low intelligence, the lack of any advice about his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022);[16] *see Oursbourn*, 259 S.W.3d at 170–71.

---

[15]Other theories of involuntariness may be raised under *Miranda* or Article 38.22, *see Oursbourn*, 259 S.W.3d at 169, but Woodard does not argue that these theories apply.

[16]In *Sandoval*, the court concluded that the appellant's confession was not coerced when he was thirty years old at the time he gave his statement and pointed to nothing to suggest that he lacked education or intelligence; the combined elapsed time for all interviews was approximately 2 hours and 25 minutes, which, the court noted, "does not seem particularly long, especially for a capital murder case"; the appellant was given his full warnings at the beginning of each interview; and the appellant's claims of mistreatment were based solely on his testimony, which the trial court was free to disbelieve. 665 S.W.3d at 523–24.

Due-Process involuntariness claims generally require an objective assessment of police behavior and not a sweeping inquiry into the suspect's state of mind. *Oursbourn*, 259 S.W.3d at 171–73 (explaining distinction between Due Process and Article 38.22 claims). We review involuntariness under the Due Process Clause by examining the totality of the circumstances surrounding the confession. *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020). To prevail on a Due-Process "involuntary confession" claim, a defendant must show (1) that police engaged in an activity that was objectively coercive, (2) that the statement is causally related to the coercive government misconduct, and (3) that the coercion overbore the defendant's will. *Id.* The court must carefully consider not only the complained-of statements made by the police but also the context in which they were made, including the demeanor of the person who made them and the statements' truth or falsity because police conduct cannot be considered in a vacuum. *Id.* at 496–97.

## D. Woodard's argument and the State's response

In support of his argument that his will was overborne, Woodard directs us to evidence that he was eighteen during the interrogation; that a neuropsychologist determined that his IQ was 88; that people who knew and interacted with him on a daily basis believed he had severe and debilitating mental-health issues; that he had limited experience at the time of the offense with the adult criminal justice system; that he had failed out of high school; and that Detective Rodriguez had used the "Reid Technique."

21

The State responds that Woodard did not present evidence at the suppression hearing to support most of these facts. Specifically, he did not present any IQ evidence or that his friends and family believed that he had mental health issues or that he had failed out of high school. Instead, during the suppression hearing, Detective Rodriguez testified that she did not know Woodard's IQ, whether he had graduated from high school, or his mental-health history before she interviewed him, and defense counsel did not ask her any questions about the Reid technique. The record reflects that no evidence was admitted about Woodard's IQ until the trial's punishment phase.

**E. Analysis**

The record shows that Woodard arrived at the police station at 8:53 a.m. and was questioned in handcuffs for a little over an hour. *See Sandoval*, 665 S.W.3d at 524 (noting that 2 hours and 25 minutes "does not seem particularly long, especially for a capital murder case"). The interview's purpose was to secure Woodard's confession, and he was asked multiple times to be honest. Detective Rodriguez learned at the interview's beginning that Woodward was eighteen and where he went to high school but not whether he had graduated. She provided to him his *Miranda* warnings before beginning the substantive questioning, inquired as to his comfort, offered him water, and had no information about his low average IQ.

Phillips denied having told Detective Rodriguez that he had seen cutting marks on Woodard's arms, and when Detective Rodriguez asked Woodard if he had ever

been diagnosed with a mental-health issue, Woodard said no, but then shared that his mother said he was probably schizophrenic because she was. No evidence was developed about the Reid technique during the suppression hearing or at trial.[17]

Woodard did not testify at the suppression hearing, so Detective Rodriguez's testimony and the video are the only evidence of any supposed mistreatment. Neither reflects any sort of threat by the police to elicit the confession. *Cf. Lopez*, 610 S.W.3d at 498–99 (holding police threats to arrest suspect's wife did not constitute objective coercive conduct under the case's circumstances). Nothing in this record reflects a police activity that was objectively coercive or that could have overborne Woodard's will. *See id.* at 494. Further, the trial court's explicit fact findings, which—as set out above—are supported by the record, are dispositive here of its legal ruling: Woodard's statement was not involuntary under the Due Process Clause. *See Johnson*, 414 S.W.3d at 192. Accordingly, we conclude that the trial court did not abuse its discretion by denying Woodard's suppression motion, and we overrule his sole issue.

---

[17]In a 2019 unpublished memorandum opinion, we observed a summary of the Reid Technique as having three parts: (1) tell the suspect that you already know for sure that he committed the crime and cut off any attempts on his part to deny it; (2) offer the suspect more than one scenario for how he committed the crime and suggest that his conduct was likely the least culpable and perhaps even morally justifiable; and (3) overstate the strength of the police's evidence that inculpates the suspect by inventing non-existent physical evidence or witness statements and assure the suspect that he will be convicted regardless of whether he talks. *Dock v. State*, No. 02-18-00462-CR, 2019 WL 6205248, at *8 n.7 (Tex. App.—Fort Worth Nov. 21, 2019, no pet.) (mem. op., not designated for publication) (quoting Dylan J. French, *The Cutting Edge of Confession Evidence: Redefining Coercion and Reforming Police Interrogation Techniques in the American Criminal Justice System*, 97 Tex. L. Rev. 1031, 1039 (2019)).

## III. Conclusion

Having overruled Woodard's sole issue, we affirm the trial court's judgment.

/s/ Mike Wallach

Mike Wallach

Justice

Do Not Publish

Tex. R. App. P. 47.2(b)

Delivered:  September 14, 2023